**BAILEY, Manager of Back Bay Migratory Waterfowl Refuge, et al. v. HOLLAND.**

No. 4884.

Circuit Court of Appeals, Fourth Circuit.

Feb. 17, 1942.

John P. Hearne, of Washington, D. C., Atty., Department of Justice (Norman M. Littell, Asst. Atty. Gen., and Vernon L. Wilkinson, of Washington, D. C., Atty., Department of Justice, on the brief), for appellants.

W. R. Ashburn, of Norfolk, Va., for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is an appeal from a judgment entered in the United States District Court for the Eastern District of Virginia, June 14, 1941, enjoining appellants from enforcing a regulation promulgated by the Secretary of Interior on October 4, 1939, which prohibited the hunting of migratory wild fowl on land and water not owned by the United States but adjacent to the federally owned Back Bay Migratory Waterfowl Refuge in Virginia. The Refuge is an "inviolate sanctuary" for migratory birds, comprising approximately 4,400 acres of islands and shorelands shown on the shaded area on the attached map. It was acquired by the United States through purchase and condemnation proceedings instituted pursuant to the Migratory Bird Conservation Act of February 18, 1929, c. 257, 45 Stat. 1222, 16 U.S.C.A., § 715 et seq.

B. P. Holland, the appellee, claims to be the owner of Landing Cove and Cedar Creek Cove adjacent to, but not a part of, the Back Bay Refuge, (A and B on map). On November 16, 1939, Holland brought this action to enjoin appellants from enforcing the aforementioned regulation which prohibited the hunting of migratory birds on approximately 5,000 acres of land and water adjoining the Refuge (indicated by dotted area on the map). Appellee's two coves comprise less than 100 acres of this closed area.

In the Migratory Bird Treaty of 1916, 39 Stat. 1702, the United States and Great Britain agreed to take the necessary measures to insure the preservation of migratory birds. A similar convention with Mexico in 1936, 50 Stat. 1311, specifically provided for the "establishment of refuge zones" in which the taking of migratory

LEGEND

BACK BAY MIGRATORY WATERFOWL REFUGE, FEE SIMPLE TITLE IN UNITED STATES

AREA CLOSED BY REGULATION

UNITED STATES DEPARTMENT OF THE INTERIOR
FISH AND WILDLIFE SERVICE

AREA IN CONTROVERSY

BAILEY ET. AL. v. HOLLAND

birds would be prohibited. These treaties have been implemented by the Migratory Bird Treaty Act of July 3, 1918, c. 128, 40 Stat. 755, and the amendatory Act of June 20, 1936, c. 634, 49 Stat. 1555, wherein it is provided, 16 U.S.C.A. §§ 703 and 704:

*"Unless and except as permitted by regulations* made as hereinafter provided * * * *it shall be unlawful at any time,* by any means or in any manner, *to pursue, hunt, take, capture, kill* * * * *any migratory bird,* or any part, nest, or egg of any such birds, included in the terms of the conventions between the United States and Great Britain for the protection of migratory birds concluded August 16, 1916 (39 Stat. 1702), and the United States and the United Mexican States for the protection of migratory birds and game mammals concluded February 7, 1936. * * *

"Subject to the provisions and in order to carry out the purposes of the conventions * * * *the Secretary of the Interior*[1] *is authorized and directed, from time to time, having due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times and lines of migratory flight of such birds, to determine when, to what extent, if at all, and by what means, it is compatible with the terms of the conventions to allow hunting,* taking, capture, killing, possession, sale, purchase, shipment, transportation, carriage, or export of any such bird, or any part, nest, or egg thereof, *and to adopt suitable regulations permitting and governing the same, in accordance with such determinations,* which regulations shall become effective when approved by the President.[2]"

Pursuant to the authority thus vested in him, the Secretary of the Interior promulgated general regulations on August 3, 1939, which were approved by the President on August 11, 1939, 4 Fed.Reg. 3621–3627, 16 U.S.C.A. § 704 note. In these regulations the Acting Secretary of the Interior declared:

"* * * I, Oscar L. Chapman, Acting Secretary of the Interior, *having due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times and lines of mi-*

*gratory flight of migratory birds* included in the terms of the Convention between the United States and Great Britain for the protection of migratory birds, concluded August 16, 1916, and the Convention between the United States and the United Mexican States for the protection of migratory birds and game mammals concluded February 7, 1936 * * * *have determined when, to what extent, and by what means it is compatible with the terms of said conventions and act to allow the hunting, taking, capture, killing, possession, sale, purchase, shipment, transportation, carriage, exportation, and importation of such birds* and parts thereof and their nests and eggs, and the exportation and importation of such mammals to and from Mexico, and, in accordance with such determinations, do hereby adopt the following regulations as suitable regulations * * *."

In Regulation 4 he provided for open seasons throughout the United States on various migratory birds, subject to the following provision:

"Nothing herein shall be deemed to permit the taking of migratory birds on any reservation or sanctuary established under the Migratory Bird Conservation Act of February 18, 1929, 45 Stat. 1222, nor on any area of the United States set aside under any other law, proclamation, or Executive order for use as a bird, game, or other wildlife reservation, breeding ground, or refuge except insofar as may be permitted by the Secretary of the Interior under existing law, *nor on any area adjacent to any such refuge when such area is designated as a closed area under the Migratory Bird Treaty Act* * * *."

On October 4, 1939, the Secretary of the Interior issued the regulation which is attacked by the appellee in the case at bar (4 Fed.Reg. 4285). This regulation "designated as closed area in or on which pursuing, hunting, taking, capturing, or killing, or attempting to take, capture, or kill, migratory birds is not permitted, all areas of land and water adjacent to the Back Bay Migratory Waterfowl Refuge, in Princess Anne County, Virginia, not now owned by the United States" within described boundaries embracing some 5,000 acres of coves, narrows and bays border-

---

[1] These functions, originally vested in the Secretary of Agriculture, were transferred to the Secretary of the Interior by Reorganization Plan No. II, § 4(f), effective July 1, 1939, 53 Stat. 1431, 1433, 1434, 5 U.S.C.A. § 133t note.

[2] Italics supplied throughout the opinion.

ing the islands and shorelands comprising the Back Bay Migratory Waterfowl Refuge (see map). And on October 16, 1939, the President issued the following proclamation, No. 2370 (4 Fed.Reg. 4287):

"And Whereas upon consideration it appears that the foregoing regulation will tend to effectuate the purposes of the aforesaid Migratory Bird Treaty Act:

"Now, Therefore, I, Franklin D. Roosevelt, President of the United States of America, under and by virtue of the authority vested in me by the aforesaid Migratory Bird Treaty Act, do hereby approve and proclaim the foregoing regulation of the Secretary of the Interior."

The appellee, in attacking the regulation as invalid, asserted that he owned lands extending to the middle of Cedar Creek Cove and all of Landing Cove (A and B on map) which were included within the closed zone; that he also owned a tract of marshland outside the closed zone which adjoined the Western half of Cedar Creek Cove (C on map); and that all his properties, together with improvements and equipment, exceeded $10,000 in value so long as they could be utilized for shooting migratory waterfowl during the open season, but that otherwise the properties were practically worthless.

The court below enjoined the appellants from enforcing the regulation insofar as it affected appellee's property. It held that the regulation was not promulgated with due regard for the standards prescribed by the Act, that it discriminated against appellee's property and that, in addition, it extended the Back Bay Refuge to include his property without payment of compensation. Accordingly, the court, on June 14, 1941, granted a permanent injunction against the appellants. This appeal duly followed.

■■ The judgment below invalidating the Secretary of the Interior's regulation establishing a "closed area" adjacent to the Back Bay Waterfowl Refuge was not bottomed on any want of power in Congress to protect migratory waterfowl. The court recognized, and the appellee conceded, that the Migratory Bird Treaty Act prohibiting all hunting of migratory birds throughout the United States "unless and except as permitted by regulations" of the Secretary of the Interior, was a valid exercise by Congress of its treaty and commerce powers. State of Missouri v. Holland, 1920, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641, 11 A.L.R. 984; United States v. Griffin, D.C. S.D.Ga.1935, 12 F.Supp. 135; United States v. Schultze, D.C.W.D.Ky.1939, 28 F.Supp. 234. Nor was the regulation invalidated for any lack of definite standards in the Act which delegated regulatory authority to the Secretary. Cerritos Gun Club v. Hall, 9 Cir., 1938, 96 F.2d 620; Shouse v. Moore, D.C.E.D.Ky.1935, 11 F.Supp. 784.

With these observations in mind, we shall discuss each of the reasons advanced by the court below in holding the regulation invalid.

The 1916 Treaty with Great Britain obligated the United States to take measures to insure the preservation of migratory birds, and the 1936 Treaty with Mexico specifically provided for the "establishment of refuge zones" in which the taking of migratory birds would be prohibited. Congress honored these obligations by enacting the Migratory Bird Treaty Act of 1918 and the amendatory Act of 1936. These statutes made it unlawful to hunt migratory birds "unless and except as permitted by regulations" of the Secretary of the Interior. In promulgating regulations, the Secretary is required to have due regard to the zones of temperature and to the distribution, *abundance,* economic value, *breeding habits,* and *times and lines of migratory flight* in determining *when, to what extent, if at all,* and *by what means, it is compatible with the terms of the conventions to allow hunting.*

■ It is patently clear that the Secretary, in closing the coves and marshy areas adjacent to the Back Bay Refuge, has duly heeded the standards prescribed in the treaties and statutes. Obviously, vantage points on waters which form the coves and narrows among the islands and peninsulas immediately adjacent to the Refuge would allow hunters there a disproportionate opportunity to kill birds, flocking to, from, and about, their sanctuary. These coves and narrows are sheltered and naturally attractive to waterfowl, especially during a storm when the more open waters are rough. The waters within the zone are also quite shallow and so furnish feeding grounds abounding in aquatic vegetation. It is thus apparent that the Secretary, in closing the area in question, has duly taken into consideration the standards fixed by the Act; and he has found it necessary to prohibit all hunting of migratory wild fowl in the closed area in order to protect the birds as they enter and leave the

Refuge, and while they are attracted to the waters surrounding it. Cf. Cerritos Gun Club v. Hall, 9 Cir., 1938, 96 F.2d 620, 624. Such regulations obviously tend to effectuate the conservation program envisaged by the Migratory Bird Treaties.

■ Without undertaking to review the numerous decisions construing the Migratory Bird Treaty Act, it may be said in general that the authority conferred upon the Secretary of the Interior has been liberally construed. By the express terms of the Act, the Secretary can prohibit the shooting of migratory wildfowl altogether, or he can determine to what extent, when, and by what means and methods, such fowl may be taken.

■ Of course, the regulations promulgated must be general in their application to all lands and persons similarly situated. A regulation may not single out specially a specific tract or tracts of land upon which waterfowl may not be taken in the open season and place all other similarly situated lands in that vicinity in the opposite class. Such a regulation would have no reasonable relation to the standards prescribed in the Act; it would have no due regard to the zones of temperature, to the distribution, abundance, economic value, breeding habits, and times and lines of migratory flight, of such birds. This brings us to appellee's second contention, namely, that the regulation is invalid because it is special in nature, is aimed at, and applies only to the lands of appellee.

The court below stated unequivocally that "The land designated and described in the regulation was that of the plaintiff alone." The record is not altogether clear on this important fact, but, as far as we can gather, the property to which appellee claims ownership, Landing Cove and part of Cedar Creek Cove, includes less than 100 acres of the 5,000 acre zone of land closed by the regulation. We presume that the ownership of the remaining acres within the closed area lodges in the Commonwealth of Virginia by way of paper title.

■ The United States claims no title to the lands within the closed area, nor do these lands form any part of the Back Bay Refuge; but the government's power to prohibit the hunting of migratory waterfowl is not confined to those lands to which it has title. The boundary line of an area thus closed to hunting has to be drawn somewhere, if it is to be drawn at all. A glance at the accompanying map shows clearly that the appellee's coves are completely surrounded by the reservation, whereas other areas merely bordering on the Refuge have been closed also. Certainly if some of these areas are to be closed, it was not only logical but fair to include within the closed area the coves owned by the appellee. Moreover, the closing line demonstrably extends broadly from headland to headland of the Refuge. This would seem to refute any idea of a possible arbitrary inclusion of appellee's properties. Furthermore, ample hunting areas in, around, and adjoining, nearby Shipps Bay, Red Head Bay and Back Bay have been left open to the appellee and to the public.

■ Since the regulation complained of prohibits *any* person from hunting within the 5,000 acre zone comprising the closed area, it cannot be said to discriminate against the appellee as a person. Wampler v. Lecompte, 1930, 282 U.S. 172, 51 S.Ct. 92, 75 L.Ed. 276; Bauer v. State Game, Forestation and Parks Commission, 1940, 138 Neb. 436, 293 N.W. 282; Sherrill v. State, 1907, 84 Ark. 470, 106 S.W. 967; Platt v. Philbrick, 1935, 8 Cal.App.2d 27, 47 P.2d 302; Barker v. State Fish Commission, 1915, 88 Wash. 73, 152 P. 537, Ann.Cas.1917D, 810. Even if it be conceded that the appellee is the only person claiming private ownership of any lands within the closed area, this, in itself, would not invalidate the regulation. Clearly, the regulation was not promulgated with any such end in view. Such a result would be unfortunate, but none the less adventitious. Our law abounds in similar instances of damnum absque injuria, a loss or damage to an individual for which the law furnishes no redress. Often (many people think too often), the greater good requires that a person must suffer in legal silence.

■ In reaching the conclusion that the regulation was valid, we have been somewhat guided by the doctrine: "It is settled that to all administrative regulations purporting to be made under authority legally delegated there attaches a presumption of the existence of facts justifying the specific exercise." Thompson v. Consolidated Gas Co., 1937, 300 U.S. 55, 69, 57 S.Ct. 364, 371, 81 L.Ed. 510; Pacific States Co. v. White, 1935, 296 U.S. 176, 185, 56 S.Ct. 159, 80 L.Ed. 138, 101 A.L.R. 853; Wampler v. Lecompte, 1930, 282 U.S. 172, 175, 51 S.Ct. 92, 75 L.Ed. 276; Thomson v. Dana, D.C.1931, 52 F.2d 759. The Pres-

ident in promulgating the regulation at issue expressly found that it would "tend to effectuate the purposes of the aforesaid Migratory Bird Treaty Act". The appellee has failed to overcome this presumption.

The Secretary's power under the 1918 Act to establish "closed areas" adjacent to government-owned bird refuges authorized under the 1929 Migratory Bird Conservation Act is further supported by consistent administrative practice. Sixteen "closed areas" contiguous to federal sanctuaries have been established in eleven different states since 1931.[3] This construction of the 1918 Act by those entrusted with its enforcement should not be overturned unless clearly erroneous. Administrative practice "has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new." Norwegian Nitrogen Co. v. United States, 1933, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796; Fawcus Machine Co. v. United States, 1931, 282 U.S. 375, 378, 51 S.Ct. 144, 75 L.Ed. 397.

It is evident, therefore, that sound reason and administrative practice support the regulation establishing the closed area in question. The fixing of boundaries in such a case naturally involves the exercise of considerable discretion. But unless clearly arbitrary, that exercise of discretion will not be reviewed by the courts. Dow v. Ickes, App.D.C. August 4, 1941, 123 F.2d 909; Blair v. McAlhaney, 4 Cir., October 17, 1941, 123 F.2d 142;

United States v. Eastman, 9 Cir., 1941, 118 F.2d 421, 425. Judicial review of administrative determinations is limited to considerations of whether there was a fair hearing and a just and reasoned application of the statute. Gray v. Powell, 62 S.Ct. 326, 86 L.Ed. ——, decided December 15, 1941.

In Dow v. Ickes, supra, the appellant unsuccessfully challenged regulations of the Secretary of the Interior closing Alaskan waters to fishing except in specified areas where exclusive permits could be granted to individual applicants. The court said [123 F.2d 913]:

"The statute invests the Secretary with the power to set aside and reserve fishing areas. The function is executive and highly discretionary. We need not determine whether he could close all Alaskan waters to all fishing. Conceivably he could do so, at least in exceptional circumstances. But he has not done so. If, however, the statute is assumed to contemplate that some area or areas shall be opened, it leaves their extent and location entirely to the Secretary's discretion. The statute prescribes no limit as to the area which shall be closed and no requirement as to that which shall be left open. It assumes that these will vary with time and circumstance, and leaves them to the Secretary's judgment. Furthermore, within the open areas he prescribes, he has authority to control the time, methods and extent of fishing. He is empowered to 'establish closed seasons during which fishing may be limited or *prohibited as he may prescribe*.' * * * He is authorized to fix the size *and character* of fishing devices; limit the catch; and 'make such regulations as to time, *means, methods,*

---

[3] Proclamations Designating Closed Areas Under the Migratory Bird Treaty Act of 1918:

| State | Refuge | No. | Date | Federal Register | | |
|-------|--------|-----|------|------|------|------|
| | | | | Vol. | Page | Date |
| Ark. .......... | Big Lake .................... | 2325 | Mar. 21, 1939 | 4 | 1309 | Mar. 24, 1939 |
| | White River ............... | 2274 | Mar. 15, 1938 | 3 | 591 | Mar. 18, 1938 |
| Fla. .......... | St. Marks .................. | 1982 | Dec. 24, 1931 | ........ | ........ | No register. |
| | St. Marks (amend.)........ | 2264 | Dec. 13, 1937 | 2 | 2808 | Dec. 16, 1937 |
| Ga. .......... | Savannah River ............ | 2329 | Apr. 10, 1939 | 4 | 1595 | Apr. 13, 1939 |
| La. .......... | Lacassine .................. | 2322 | Feb. 7, 1939 | 4 | 611 | Feb. 10, 1939 |
| Md. .......... | Susquehanna ................ | 2347 | Aug. 24, 1939 | 4 | 3743 | Aug. 29, 1939 |
| | Susquehanna (addition)..... | 2383 | Jan. 24, 1940 | 5 | 313 | Jan. 27, 1940 |
| N. C.......... | Pea Island .......... ........ | 2284 | May 9, 1938 | 3 | 912 | May 12, 1938 |
| | Swanquarter ................ | 2129 | July 18, 1935 | ........ | ........ | No register. |
| Oreg. ........ | Malheur ..................... | 2516 | Oct. 1, 1941 | 6 | 5053 | Oct. 4, 1941 |
| S. C.......... | Cape Romain ............... | 2000 | June 6, 1932 | ........ | ........ | No register. |
| Tex. .......... | Aransas .................... | 2314 | Nov. 26, 1938 | 3 | 2807 | Dec. 1, 1938 |
| | Aransas (amend.) ........... | 2473 | Apr. 15, 1941 | 6 | 1995 | Apr. 18, 1941 |
| Va. .......... | Back Bay .................... | 2370 | Oct. 16, 1939 | 4 | 4285 | Oct. 19, 1939 |
| Wash. ....... | Willapa .................... | 2439 | Nov. 7, 1940 | 5 | 4443 | Nov. 13, 1940 |

and extent of fishing, as he *may deem advisable.'* * * *

"Broader discretion hardly could have been conferred. The power to discriminate is geographical, temporal, mechanical, quantitative, and selective as to different varieties of fish. *Taking of herring could be permitted, of salmon prohibited.* Use of seines and boats with nets could be allowed, that of dynamite and traps prohibited. * * *

"It is apparent that the court has no power to interfere with the exercise of the Secretary's discretion under the statute by directing him affirmatively to approve the specific sites for which appellant has applied or to open to salmon fishing by traps a general area or areas which would include such sites. To do either would be to require him to open for such fishing areas which he has determined shall be closed to it. *This in effect would oust him of his discretion and substitute the court's judgment for it.*" (Italics ours.)

Appellee's final contention, which was accepted by the court below, is that the regulation extended the boundaries of the government owned reservation and thereby confiscated a valuable property right without payment of compensation. Any injury thus caused results from an exercise by the Government of its police power and not of its power of eminent domain. Geer v. Connecticut, 1896, 161 U.S. 519, 528, 529, 16 S.Ct. 600, 40 L.Ed. 793; Brandenburg v. Doyle, D.C.S.D.Ill.1935, 12 F.Supp. 342; Shouse v. Moore, D.C.E.D.Ky.1935, 11 F. Supp. 784; Bauer v. State Game, Forestation and Parks Commission, 1940, 138 Neb. 436, 293 N.W. 282; cf. Mugler v. Kansas, 1887, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205.

If the Government wishes to do more in the way of protecting migratory birds than prohibiting their slaughter, e. g., erect improvements to lessen the dangers resulting from the drainage of marshy areas, it must acquire some proprietary interest in the areas suitable for such uses. It was to meet this need that Congress enacted the Migratory Bird Conservation Act of February 18, 1929, c. 257, 45 Stat. 1222, 16 U.S.C.A. § 715 et seq. Land purchased under this Act becomes an "inviolate sanctuary" over which the Government acquires complete dominion so that it can erect buildings, fences, ditches, dams, or do any other affirmative acts upon the property for the general welfare of the birds. 16 U.S. C.A. §§ 715i, 715k. And in order to make this refuge more effective, the Secretary may prohibit all hunting in that immediate vicinity. Cf. United States v. Alford, 1927, 274 U.S. 264, 47 S.Ct. 597, 71 L.Ed. 1040. The 1929 Act does not deprive the Secretary of his regulatory authority under the 1918 statute. Merely because the Government purchases certain land in order to do more than prohibit hunting, it does not follow that compensation must be made for all land closed to hunting. Platt v. Philbrick, 1935, 8 Cal.App.2d 27, 31, 47 P.2d 302. The lower court's contrary holding, we think, would lead to unfortunate limitations on the power of the Secretary to restrict or prohibit the hunting of migratory birds on lands not federally owned. Such a conclusion appears to be contrary to the spirit of the 1918 Act, which expressly prohibits *all* hunting throughout the United States *except* insofar as the prohibition may be relaxed by regulations promulgated by the Secretary. See Cochrane v. United States, 7 Cir., 1937, 92 F.2d 623; United States v. Griffin, D.C.S.D.Ga.1935, 12 F.Supp. 135.

The distinction between a "closed area," which may well embrace privately owned lands, and a federally owned "inviolate sanctuary" seems clear. Hence the regulation establishing the closed area in question did not extend the boundaries of the refuge proper; nor did this regulation involve any invasion or taking of appellee's land.

For the reasons assigned, the judgment of the District Court is reversed.

Reversed.