The SWAN LAKE HUNTING CLUB and the State of Mississippi, Appellants,

v.

UNITED STATES of America, Appellee.

No. 23551.

United States Court of Appeals
Fifth Circuit.

July 12, 1967.

Rehearing Denied Aug. 9, 1967.

J. Robertshaw, Greenville, Miss., G. Garland Lyell, Jr., Asst. Atty. Gen., Jackson, Miss., Robertshaw & Merideth, Joe T. Patterson, Atty. Gen., State of Mississippi, Jackson, Miss., for appellants.

Edwin L. Weisl, Jr., Asst. Atty. Gen., Roger P. Marquis, William M. Cohen, Attys., Dept. of Justice, Washington, D. C., Hosea M. Ray, U. S. Atty., Thomas G. Lilly, Asst. U. S. Atty., Oxford, Miss., for appellee.

Willard Walker, Calbom, Walker, Cox & Andrews, Longview, Wash., for amicus curiae.

Before BELL and GODBOLD, Circuit Judges, and NOEL, District Judge.

GODBOLD, Circuit Judge:

Swan Lake Hunting Club and the State of Mississippi appeal from a summary judgment for the United States in an action to condemn hunting rights owned by the Club on land in Washington County, Mississippi. We affirm.

Swan Lake Hunting Club, a Mississippi corporation, owned the hunting rights to a swamp area known as Swan Lake (actually a silted-in bed of the Mississippi River). The Club, which in 1962 contained forty-five members, used the area as a private hunting preserve and maintained blinds, hunting trails and a club house. Even before federal regulations affected the taking of waterfowl, the Club had restricted the extent and manner of hunting by members and their guests.

In the 1930's the United States acquired 2,500 acres of land to the southwest of Swan Lake and has since maintained this area as the Yazoo Wild Life Refuge pursuant to the Migratory Bird Conservation Act, 16 U.S.C.A. 715 et seq. A program of expansion was begun in 1958, and the United States purchased or acquired options to purchase approximately 10,770 acres of additional land. This included the area on which the Club owned the hunting rights; as to this land, the government's title was subject to the Club's hunting rights now sought to be condemned.

Complaints and declarations of taking were filed pursuant to 40 U.S.C.A. 257 and 258a in three separate cases which were consolidated on motion of the Club.[1] The Club answered and asserted a counterclaim for damages for wrongful temporary taking. All three parties moved for summary judgment. The District Court granted the motion of the United States and denied those of appellants. 237 F.Supp. 290 (N.D.Miss., 1964). Title was ordered vested in the United States and payment of the stipulated just compensation ($37,000) ordered made to the Club.

On appeal appellants claim that no authority for the condemnation is conferred by the Migratory Bird Conservation Act; that if such power is conferred its exercise in this case amounts to an unconstitutional taking for a private use; and that if the power and its exercise are valid, the necessary consent of the state has not been obtained.

## I. AUTHORITY FOR CONDEMNATION

No specific authority to acquire lands by condemnation is conferred by the Migratory Bird Conservation Act, but the Secretary of the Interior is authorized to "purchase or rent" areas approved by the Migratory Bird Conservation Commission for use as sanctuaries.[2] However, 40 U.S.C.A. § 257 authorizes an officer of the United States to acquire land by condemnation "[i]n every case in which [the officer] * * * has been, or hereafter shall be authorized to procure real estate for * * * public use." This statute consistently has been interpreted to authorize acquisition by condemnation where specific authority to purchase has been conferred. E. g., Hanson Lumber Co. v. United States, 261 U.S. 581, 43 S.Ct. 442, 67 L.Ed. 809 (1923); United States v. 2.74 Acres, 32 F.Supp. 55 (D.Ill.1940) ["statutory authority to acquire land for a public use by purchase is authority to acquire by condemnation * * *"]; United

---

1. The State of Mississippi was made a defendant because of possible interests it might have in the land based on tax claims. It has, without attempting to establish any such claim, actively opposed the effort of the United States to condemn the hunting rights of the Club. The United States now argues that Mississippi, having asserted no right in the land, lacks standing to appeal and, relying on United States v. Eighty Acres of Land, 26 F.Supp. 315 (E.D.Ill., 1939), that the Club is without standing to raise lack of state consent; consequently, it urges, the issue of state consent is not properly before us. Because we find no meritorious objection to the taking has been raised, we do not discuss the standing of either the Club or the State of Mississipi in this appeal.

2. 16 U.S.C.A. § 715d.

States v. Kennedy, 278 F.2d 121 (9th Cir., 1960).

 Appellants assert that the Migratory Bird Conservation Act itself demonstrates that the authorization for procurement of land contained in the Act was intended to be limited to voluntary sales and leases and not to be expanded by Sec. 257 to include condemnation. We are referred to numerous instances in the Act of words commonly used only with reference to voluntary transactions. Moreover, it is urged, when the purpose for which the land is intended is not "directly" related to a major national interest, we should be reluctant to use Sec. 257 to expand the scope of an authorization to procure land in the absence of an indication that Congress intended the specific authorization to be so extended.[3]

 Without commenting on the possibility that in a different case it might be shown by language in the authorization itself (short of an express limitation to voluntary procurement) that Congress intended the authority conferred to be beyond the scope of Sec. 257, we hold that in this case no such showing has been made. The power to purchase conferred by the Act, when combined with Sec. 257, confers the power to acquire by condemnation.[4]

## II. THE PURPOSE FOR WHICH TAKEN

If the statutes are construed to confer power to acquire land by condemnation for purposes of the Act, the appellants contend the exercise of the power in this case is unconstitutional. While conceding that the provision for an inviolate refuge to preserve migratory birds would be a public use, they urge that the fact, which is admitted, that regulated public hunting will be allowed on the reserve transforms the taking into one for a private use.

██ If one's property were taken for private use by the government through the process of condemnation he would be deprived of substantive due process of law as guaranteed by the Fifth Amendment to the Constitution. O'Neill v. Leamer, 239 U.S. 244, 36 S.Ct. 54, 60 L.Ed. 249 (1915). There is significant state authority for the proposition that public hunting is not a "public use" as required for exercise of the eminent domain power. Peavy-Wilson Lumber Co. v. Brevard County, 159 Fla. 311, 31 So.2d 483 (1947); Hampton v. Arkansas State Game and Fish Comm., 218 Ark. 757, 238 S.W.2d 950 (1951). Cf. Ann., 172 A.L.R. 174 (1948); however, "whatever may be the scope of the judicial power to determine what is a 'public use' * * * [the Supreme Court] has said that when Congress has spoken on this subject 'Its decision is entitled to deference until it is shown to involve an impossibility'." United States ex rel. T.V.A. v. Welch, 327 U.S. 546, 552, 66 S.Ct. 715, 718, 90 L.Ed. 843, 848 (1946).

██ But we need not here reach the question whether public hunting is a

---

3. Several cases in which no issue was raised as to the authority to condemn show that the power of condemnation has been invoked under the Act for a number of years. United States v. Forty Acres, 24 F.Supp. 390 (D.Idaho, 1938); Bailey v. Holland, 126 F.2d 317 (4th Cir., 1942). Cf. United States v. 2,271.29 Acres, 31 F.2d 617 (D.Wis., 1928). Congressional continuation of an appropriation which, under administrative practice, is used for acquiring realty by condemnation constitutes "virtual ratification of the administrative construction [of the statute as authorizing condemnation]". United States v. Kennedy, 278 F.2d 121, 126 (9th Cir., 1960).

4. Appellants also urge that retention by the club of the restricted and limited exercise of the hunting rights by members is not inconsistent with use of the land by the United States for either refuge or public hunting purposes. But "[t]his Circuit has repeatedly recognized that the courts have no jurisdiction to review the legislative or administrative discretion as to the extent of the right, interest or estate in property to be taken." 2,953.15 Acres of Land, etc. v. United States, 350 F.2d 356, 360 (5th Cir., 1965) (and cases cited at note 7 therein).

public purpose. Where both public and private use are to be made of property sought to be condemned, the exercise of the power will not be defeated if the private use is sufficiently subordinate to the public use as to be incidental to it. Hendersonville Light & Power Co. v. Blue Ridge Interurban R. Co., 243 U.S. 563, 37 S.Ct. 440, 61 L.Ed. 900 (1917); United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913); Kaukauna Water-Power Co. v. Green Bay & M. Canal Co., 142 U.S. 254, 12 S.Ct. 173, 35 L.Ed. 1004 (1891). See generally 2 Nichols, Eminent Domain Sec. 7.222 (1963); 26 Am. Jur.2d Eminent Domain Sec. 35 (1966); 29A C.J.S. Eminent Domain § 31(c) (1965); Ann., 53 A.L.R. 9, 12 (1928). There is no doubt, and it is conceded here, that establishment of sanctuaries for the preservation of waterfowl is a legitimate public purpose. See State of Missouri v. Holland, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920). Congress has taken the position that carefully regulated hunting is not inconsistent with its paramount duty under the Migratory Bird Conservation Treaty of 1918 to preserve migratory waterfowl. 16 U.S.C.A. § 704. Cf. 16 U.S.C.A. § 683. In a similar vein Congress has authorized restricting hunting in areas used for purposes of the Migratory Bird Conservation Act.[5] Giving due respect to congressional judgment as we must, we hold that any private benefit which may result from the limited public hunting to be allowed on the planned refuge is incidental to the legitimate public purpose of preserving migratory waterfowl.[6]

## III. THE CONSENT OF THE STATE

Appellants contend finally that the Migratory Bird Conservation Act establishes consent of the state as a condition precedent to any exercise of the power of eminent domain and that sufficient consent has not been obtained for this taking.

■ In most situations where United States agencies are authorized to procure realty, acquisition is not conditioned upon consent of the state wherein the land lies. Consistently it has been held that where no such express condition had been placed on the authority to acquire land the state may not interfere with the exercise of the authority. United States ex rel. T.V.A. v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943). The acquisition of land for purposes of the Migratory Bird Act is, however, one of the few exceptions.

When Congress passed the Migratory Bird Conservation Act in 1929, it authorized the purchase or rental of areas for use as sanctuaries in substantially the language presently set out in 16 U.S.C.A.

---

5. Refuges established under the Migratory Bird Conservation Act originally could be operated only as "inviolate sanctuaries." But in 1958 Congress authorized up to 40 percent of any area maintained under the Act to be opened to public hunting. 72 Stat. 486. This authority now appears at 16 U.S.C.A. § 668dd(d) (1).

6. Among the factors we deem significant as to the incidental nature of public hunting are the following. 16 U.S.C.A. § 668dd(d) (1) limits the area that may be opened to 40 per cent of the refuge. Under the same section, use for hunting and recreation only is to be permitted by the Secretary only when "he determines that such uses are compatible with the major purposes for which such areas were established." Significant evidence exists that Congress, in authorizing limited pub-

lic hunting, considered public hunting instrumental in achieving the primary conservation purposes of the refuges:
"Discretionary latitude in the opening of national waterfowl-refuge lands to public hunting would make it possible to compensate for seasonal variations in the quality of feeding and resting grounds resulting from water conditions and many other factors beyond the control of management. A further consideration is the frequent need of allowing additional hunting to cope with problems of waterfowl depredation or to allow for an adequate harvest of species in abundance. It would also make it possible to take prompt corrective action in dealing with devastating eruptions of botulism or other waterfowl diseases."
S.Rep. No. 1426, 85th Cong., 2d Sess.

§ 715d. 45 Stat. 1222 Sec. 5. Sec. 7 of the Act then provided:

"[N]o deed or instrument of conveyance shall be accepted by the Secretary * * * under this Act unless the State in which the area lies shall have consented by law to the acquisition by the United States of lands in that State."

Almost identical language presently is found in 16 U.S.C.A. § 715f.

In 1934 the Migratory Bird Hunting Stamp Act was passed for the express purpose of "providing funds for the acquisition of areas for use as migratory bird sanctuaries, refuges and breeding grounds." The Act (presently 16 U.S. C.A. § 718 et seq.) required the purchase of a hunting stamp by any person wishing to hunt migratory waterfowl; the proceeds from the stamps were to be paid into the Treasury but earmarked in a special fund, the Migratory Bird Conservation Fund, to be used for the purchase and maintenance of areas for the purposes set out in the Migratory Bird Conservation Act.

In 1961 a $105,000,000 appropriation was authorized to be used over the next seven years for interest-free loans to the Migratory Bird Conservation Fund. The purpose of the bill as introduced in the House of Representatives was to permit immediate acquisition of land which otherwise would be diverted for other uses or would increase in cost. H. R. Report No. 545, 87th Cong., 1st Session (1961). The Senate Committee on Commerce, without comment, added the following proviso:

"Provided further: That no land shall be acquired with moneys from the migratory bird conservation fund unless the acquisition thereof has been approved by the Governor of the State or appropriate State agency."

See S. Report No. 705, 87 Cong., 1st Session (1961). The House acquiesced at conference. H.R. Report No. 1184, 87th Cong., 1st Sess. (1961), and the proviso now appears at 16 U.S.C.A. 715 k–5.

The congressional history of the 1961 proviso suggests that it does not contemplate action by the state legislatures (as did the original Act) but approval by either the governor or a state executive agency of acquisition of each specific tract. This was prior administrative practice, and the statutory provision was intended merely to formalize it. Senator Magnuson commented on the floor of the Senate:

"[W]e do this anyway, but thought we would make it more safe—to provide that no land should be purchased under the plan unless the Federal Government and the State involved had a complete agreement, either with the Governor or the State agency * *. It is provided that they must be in complete agreement *as to the nature of the lands and the acreage involved.*"

74 Cong. Record 117111 (May 28, 1961). (Emphasis provided).

▋ It is clear, then, that land may not be acquired for purposes of the Migratory Bird Conservation Act with funds from the Migratory Bird Conservation Fund unless (a) the state in which the land is located has "consented by law to the acquisition by the United States of land in that State," and (b) the governor or appropriate state agency has approved acquisition of the specific land sought to be acquired.

In 1930, the Mississippi Legislature enacted what now is Miss.Code Ann. Sec. 5928:

"Federal migratory bird refuges.— Consent of the State of Mississippi is hereby given to the acquisition by the United States by purchase, lease or gift of such land in Mississippi as in the opinion of the Federal Government and the Governor of the State may be needed for the establishment of national migratory bird refuges in this region * * *."

No reported Mississippi court decision has interpreted the provision.

Proposals concerning expansion of the Yazoo Refuge were submitted to the Mis-

sissippi State Game and Fish Commission and on Oct. 18, 1960, the Regional Director of the Bureau of Sports Fisheries and Wildlife (Fish and Wildlife Service) received the following letter from Governor Ross R. Barnett (to which was affixed a map showing the proposed boundaries of the expanded refuge):

"In reference to your letter request of September 19, 1960, for consent of the State of Mississippi to the purchase of additional lands to be added to the Yazoo National Wildlife Refuge, I am pleased to advise that under the provisions of Section 5928 of the Mississippi Code of 1942, Recompiled, this consent is given in accordance with your proposals and management plans submitted to the State Game and Fish Commission and for the area proposed for purchase at this time and shown on the attached signed map. It is my understanding that proposals in writing have been made to the State Game and Fish Commission by the U. S. Fish and Wildlife Service, whereby, under the provisions of existing law, a portion of the additional lands to be acquired will be set aside for public waterfowl hunting when wintering populations permit consistent with good management of this resource. Also, public hunting and fishing on resident game species and migratory upland game birds will be permitted on refuge lands when not inconsistent with the refuge's migratory bird management program."

Appellants allege that these actions by the legislature and Governor of Mississippi do not constitute sufficient consent to permit the condemnation of their hunting rights. We disagree.

■ First, appellants say that Sec. 5928 constitutes consent only to acquisition by voluntary means and does not authorize condemnation, that "purchase, lease or gift" as contained in Sec. 5928

must be read to exclude condemnation. The Mississippi statute was passed to implement the programs authorized in the Migratory Bird Conservation Act of 1929. The authorization in that Act included authority to acquire land by condemnation. There is no indication that the Mississippi legislature intended to authorize anything less than full implementation of the federal program; in fact, its use of the very words of the federal statute leads to the opposite conclusion. In the absence of any concrete indication that the Mississippi legislature intended anything else, we hold that the authorization to acquire by "purchase, lease or gift" in Sec. 5928 means substantially the same thing as do the identical words in the federal Act and therefore includes the authority to acquire by condemnation.[7]

Second, appellants say that Governor Barnett did not consent to condemnation of the hunting rights and consequently the requirement of 16 U.S.C.A. 715k–5 has not been met. In support they produce Governor Barnett's response to interrogatories in which he specifically disclaims having consented to the acquisition of the hunting rights (as opposed to the land itself) and to the acquisition of either the land or the hunting rights by condemnation.

■ We need not dwell on whether a state governor or agency could effectively condition consent to the acquisition of land because here unconditional consent was given. In his letter of September 18, Governor Barnett consented "under the provisions of Sec. 5928 of the Mississippi Codes" to the "purchase" of of the "lands" in question; no limitation was placed on this broad language. The only fair meaning that can be attributed to the Governor's 1960 language is that he consented to purchase as authorized in Sec. 5928 (which, as we have held above, includes acquisition by condem-

---

7. We do not reach the question whether a state legislature could prevent the United States from exercising the power of condemnation by consenting to acquisition of

land within its boundaries pursuant to 16 U.S.C.A. § 715f only if obtained by voluntary transfer.

nation) of whatever rights in the land were deemed necessary to the project. His disclaimer made nearly three years later cannot alter the legal effect of words uttered in 1960.

 Finally, appellants claim that the consent of the legislature embodied in Sec. 5928 applies only to the acquisition of land for purposes of an inviolate refuge as originally contemplated by the Migratory Bird Conservation Act, hence there has been no consent as required by 16 U.S.C.A. § 715d to this project which is not an inviolate refuge. Nor, it is argued, has the Governor been authorized to consent to acquisition for a purpose other than an inviolate refuge, hence his consent, unauthorized by the legislature, does not meet the requirement of 16 U.S. C.A. § 715k-5. But the Mississippi statute does not use the language "inviolate sanctuary" contained in 16 U.S.C.A. § 715k (and in the original Act); rather, it refers to "national migratory bird refuges." Moreover, power is expressly conferred on Congress to make such criminal and civil rules "as in its judgment may be necessary for the management, control or protection of such land as may * * * be acquired * * *" We conclude that the State of Mississippi and its Governor did unconditionally consent to the acquisition of all interests in the land here involved for purposes of the Migratory Bird Conservation Act. The legal effect of these actions was to authorize full implementation of the Act, and this legal effect cannot be modified by subsequent disclaimers of such intention.

We conclude that the power of condemnation may be used to acquire land for use as a migratory bird refuge, that any possible private use which might arise by use of the land for public hunting is merely incidental to its primary conservation purposes, and that the Mississippi legislature and Governor consented to the acquisition of the hunting rights here involved by condemnation. The judgment is therefore affirmed.