UNITED STATES of America, Appellee,

v.

STATE OF NORTH DAKOTA, Appellant.

No. 80–1655.

United States Court of Appeals, Eighth Circuit.

Submitted April 15, 1981.

Decided June 3, 1981.

Rehearing Denied July 21, 1981.

---

Allen I. Olson, Robert O. Wefald, Attys. Gen., State of N. D., Bismarck, N. D., Murray G. Sagsveen, Zuger & Bucklin, Bismarck, N. D., Sp. Asst. Atty. Gen., State of N. D., for appellant.

James W. Moorman, Asst. Atty. Gen., Washington, D. C., James R. Britton, U. S. Atty., Lynn E. Crooks, Asst. U. S. Atty., Fargo, N. D., Robert L. Klarquist, Dept. of Justice, Washington, D. C., for appellee.

Thomas G. Tomasello, Joel T. Thomas, Washington, D. C., for amici curiae National Wildlife Federation and North Dakota Wildlife Federation.

Before LAY, Chief Judge, ROSS, Circuit Judge, and ROBINSON,* Senior District Judge.

ROBINSON, Senior District Judge.

This is an action by the United States to declare certain North Dakota statutes null and void because they are at odds with the provisions and purposes of federal statutes which protect migratory birds. The United States also seeks a declaration that the Secretary of the Interior can acquire land in

* Richard E. Robinson, Senior District Judge, District of Nebraska, sitting by designation.

North Dakota for "Waterfowl Production Areas" without obtaining the consent or approval of the Governor. North Dakota filed a counterclaim to enjoin the United States from acquiring land without obtaining additional consent from appropriate state officials.

The District Court[1] held that, to the extent they conflict with federal law, the challenged North Dakota statutes are invalid and that gubernatorial consent is not a pre-requisite to the acquisition of waterfowl production areas. North Dakota's counterclaim was dismissed for lack of subject matter jurisdiction. We affirm.

*Background*

Migratory birds have been protected by treaty and by federal statute for over sixty years. A brief review of that protection lends perspective to this controversy.

On December 8, 1916, President Wilson proclaimed a treaty with Great Britain (on behalf of Canada) 39 Stat. 1702 for the protection of the "many species of birds [which] in their annual migration traverse certain parts of the United States and . . . Canada." *Id.* Subsequent treaties have been signed with other nations to afford migratory birds similar protection.[2] In 1918, Congress passed the Migratory Bird Treaty Act (Treaty Act) 16 U.S.C. §§ 703–711 (original version at Ch. 128, §§ 2–3, 40 Stat. 755). The statute's stated purpose is to implement the treaty between the United States and Great Britain. Generally, it proscribes, subject to regulations issued by the Secretary of Agriculture, the hunting, capture, possession and sale of migratory birds.

Shortly after its enactment, the Treaty Act was challenged on constitutional grounds. In *Missouri v. Holland*, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920) the state argued that the act interfered with its sovereign ownership of the wild game within its borders · in violation of the Tenth Amendment. The Court upheld both the treaty and the statute. Writing for the majority, Justice Holmes observed:

> Here a national interest of very nearly the first magnitude is involved. It can be protected only by national action in concert with that of another power. The subject matter is only transitorily within the State and has no permanent habitat therein. But for the treaty and the statute there soon might be no birds for any power to deal with.

252 U.S. at 435, 40 S.Ct. at 384. *See generally Bailey v. Holland*, 126 F.2d 317, 319–20 (4th Cir. 1942).

In 1929, the Migratory Bird Conservation Act (Conservation Act) 16 U.S.C. § 715 et seq. was enacted. Complementing the Treaty Act,[3] it authorizes the Secretary of the Interior to acquire land for inviolate migratory bird sanctuaries but conditions that acquisition on the consent of the state in which the land is located.[4] 45 Stat. 1222, Sec. 5. *See also United States v. Carmack*, 329 U.S. 230, 241 n.10, 67 S.Ct. 252, 256–257 n.10, 91 L.Ed. 209 (1946). Together, the

---

1. The Honorable Bruce M. Van Sickle, United States District Judge for the District of North Dakota.

2. Similar agreements have been reached with Mexico, Convention for the Protection of Migratory Birds and Game Mammals, United States-Mexico, Feb. 7, 1936, 50 Stat. 1311, Japan, Convention for the Protection of Migratory Birds, United States-Japan, March 4, 1972, 25 U.S.T. 3329, and the Soviet Union, Convention concerning the Conservation of Migratory Birds and Their Environment, United States-Soviet Union, Nov. 19, 1976, T.I.A.S. 9073.

3. The Conservation Act was passed for the express purpose of meeting our treaty obligations with Great Britain by "lessening the dangers threatening migratory game birds from drainage and other causes, by the acquisition of areas of land and of water to furnish in perpetuity reservations for the adequate protection of such birds." Chapter 257, 45 Stat. 1222. A section of the current act provides that acquired land "shall . . . be administered by the Secretary of the Interior . . . to conserve and protect migratory birds in accordance with treaty obligations with Mexico, Canada, Japan, and the Union of Soviet Socialist Republics. . . ." 16 U.S.C. § 715i.

4. The state consent requirement is now found in section 715f of the Act:

> No deed or instrument of conveyance shall be accepted by the Secretary of the Interior under sections 715 to 715d, 715e, 715f to 715k and 715–*l* to 715r of this title unless the

Treaty Act—in regulating hunting and possession—and the Conservation Act—by establishing sanctuaries and preserving natural waterfowl habitat—help implement our national commitment to the protection of migratory birds.

To fund the acquisition of the migratory bird sanctuaries provided for in the Conservation Act, Congress passed the Migratory Bird Hunting and Conservation Stamp Act (Stamp Act) in 1934.[5] 16 U.S.C. § 718 et seq. The Stamp Act provides that anyone hunting migratory birds is required to purchase a hunting stamp. The revenue generated from the sale of these stamps is placed in a special fund known as the Migratory Bird Conservation Fund which in turn is used to acquire refuge areas.[6]

The Stamp Act also authorizes the Secretary of the Interior to acquire the water fowl production areas which are at issue here. Waterfowl production areas are described in the statute as "small wetland and pothole areas." These areas, like the refuge areas, are financed through the Migratory Bird Conservation Fund. Section 718d(c), however, provides that waterfowl production areas may be acquired without complying with the limitations and requirements of the Conservation Act.[7]

In 1961 Congress passed the Wetlands Loan Act 75 Stat. 813. Codified in sections 715k–3 to k–5 of the Conservation Act, it provides for interest free loans to the migratory bird conservation fund but adds the proviso that no land can be acquired with moneys from the fund unless the acquisition is approved by the governor or by an appropriate state agency.[8]

The statutes highlighted above protect migratory birds, in part, by providing for the acquisition and preservation of their environment. Provision is made to acquire at least two types of habitats, bird sanctuaries and waterfowl production areas, with money from the Migratory Bird Conservation Fund. The Conservation Act provides that sanctuaries may be acquired only with state consent.[9] See United States v. 1,216.-83 Acres of Land, 573 F.2d 1054, 1055 (9th Cir. 1978); Swan Lake Hunting Club v. United States, 381 F.2d 238, 242–43 (5th Cir. 1967). A dispute about whether state consent is also required for the acquisition of waterfowl production areas precipitated this controversy.

*Facts*

The Fish and Wildlife Service of the Department of the Interior has acquired over

State in which the area lies shall have consented by law to the acquisition by the United States of lands in that State.

**5.** See 48 Stat. 451.

**6.** Section 718d provides in pertinent part that:
All moneys received for such stamps shall be ... paid into the Treasury of the United States, and shall be reserved and set aside as a special fund to be known as the migratory bird conservation fund, to be administered by the Secretary of the Interior....
(a) * * *
(b) Except as authorized in subsection (c) of this section, the remainder shall be available for the location, ascertainment, and acquisition of suitable areas for migratory bird refuges under the provisions of the Migratory Bird Conservation Act and for the administrative costs incurred in the acquisition of such areas.

**7.** Section 718d(c) provides that:
The Secretary of the Interior is authorized to utilize funds made available under subsection (b) of this section (See note 6 *supra*) for the purposes of such subsection ... or of

this subsection, to acquire, or defray the expense incident to the acquisition by gift, devise, lease, purchase, or exchange of, small wetland and pothole areas, interests therein, and rights-of-way to provide access thereto. Such small areas, to be designated as "Waterfowl Production Areas," may be acquired without regard to the limitations and requirements of the Migratory Bird Conservation Act....

**8.** Section 715k–5 provides that:
Funds appropriated pursuant to sections 715k–3 to 715k–5 of this title shall be treated as an advance, without interest, to the migratory bird conservation fund. Such appropriated funds, beginning on October 1, 1983, shall be repaid to the Treasury out of the migratory bird conservation fund.... No land shall be acquired with moneys from the migratory bird conservation fund unless the acquisition thereof has been approved by the Governor of the State or appropriate State agency.

**9.** See note 4 *supra*.

750,000 acres of permanent easements as waterfowl production areas in North Dakota. All of the acreage has been acquired with the consent of the Governor or an appropriate state official. Approval was obtained from Governor Guy between 1961 and 1964 for the acquisition of acreage in forty-one North Dakota counties and the current Governor, Arthur Link, approved various acreage adjustments between 1973 and 1977. This consent is sufficient to enable the Fish and Wildlife Service to meet its acquisition objectives for waterfowl production areas in North Dakota.

In 1977 North Dakota passed legislation limiting and placing conditions on any further acquisitions by the federal government. Additional acquisitions are now subject to the approval of the board of county commissioners in the county where the land is located. The county agent in the affected county is required to prepare an impact analysis for the county board and the Department of the Interior must reimburse the county for the cost of the analysis. In addition, the affected land owner is permitted to negotiate the terms and duration of the lease or easement.[10]

**10.** N.D.Cent. Code 20.1–02–18 provides in part:

North Dakota consents, subject to the conditions of sections 20.1–02–18.1 and 20.1–02–18.2, to the United States acquiring, by purchase, gift, devise, or lease, land or water in this state as the United States may deem necessary to establish migratory bird reservations in accordance with the federal Migratory Bird Conservation Act. (citation omitted)

N.D.Cent. Code 20.1–02–18.1 provides:

*Federal wildlife area acquisitions—Submission to county commissioners, opportunity for public comment, and impact analysis required.*—The governor, the game and fish commissioner, or their designees, responsible under federal law for final approval of land, wetland, and water acquisitions by the United States department of the interior, its bureaus or agencies, for waterfowl production areas, wildlife refuges or other wildlife or waterfowl purposes, shall submit the proposed acquisitions to the board of county commissioners of the county or counties in which the land, wetland, and water areas are located for the board's recommendations. An affirmative recommendation by the board must be obtained prior to final approval of all such proposed acquisitions, whether by transfer of title, lease, easement, or servitude . . . .

A detailed impact analysis from the federal agency involved shall be included with the acquisition proposal for board of county commissioner consideration in making recommendations . . . . In addition, the county agent of the affected county or counties shall prepare an impact analysis for board of county commissioner consideration which shall include the fiscal, social and agricultural impacts of the proposed acquisitions. The department of the interior shall reimburse the county or counties for any expenses incurred by the county agent in preparing the analy-

sis. The analyses shall also be forwarded to the state planning division which shall furnish copies to all interested state agencies and political subdivisions, which agencies and political subdivisions shall have thirty days to review the analyses and return their comments to the state planning division. Upon expiration of the thirty-day period, all comments received by the state planning division shall be forwarded to the federal agency involved and to the state official or agency responsible for final acquisition approval. The federal agency may, after consideration of such comments, file a final impact analysis with the governor, the board of county commissioners, and any other state official or agency responsible for final acquisition approval.

N.D.Cent. Code 20.1–02–18.2 provides:

*Negotiation of leases, easements, and servitudes for wildlife production purposes.*—A landowner may negotiate the terms of a lease, easement, or servitude for land, wetland, or water areas sought to be acquired by the United States department of the interior, its bureaus or agencies, with moneys from the migratory bird conservation fund [16 U.S.C. 718d] for use as waterfowl production areas, wildlife refuges, or for other wildlife purposes. A landowner may:

1. Negotiate the time period of the lease, easement, or servitude being sought.

2. Restrict a lease, easement, or servitude by legal description to the land, wetland, or water areas being sought, and may drain any after-expanded wetland or water area in excess of the legal description in the lease, easement, or servitude.

Failure by the department of the interior, its bureaus or agencies, to agree to and comply with the above provisions shall nullify North Dakota's consent to the federal act under section 20.1–02–18.

North Dakota has also restricted the duration of any lease, easement or servitude to 99 years.[11]

The United States seeks a judgment declaring that, to the extent they conflict with the federal policy of protecting migratory birds, these statutes are null and void. A judgment is also sought declaring that waterfowl production areas can be acquired without the consent of North Dakota's Governor.

*Gubernatorial Consent and Waterfowl Production Areas*

North Dakota contends that gubernatorial consent is required for the acquisition of waterfowl production areas and that any previous consent has been revoked by Governor Link. The state also points out that it has shifted its policy of giving unconditional approval to federal acquisitions by passing the 1977 amendments to section 20.1–02–18 of the North Dakota Century Code. The linchpin of the state's argument is that gubernatorial consent is in fact required. For this proposition North Dakota relies on section 715k–5 of the Conservation Act which requires state approval for all land acquired with moneys from the migratory bird conservation fund. Since waterfowl production areas are so acquired, North Dakota argues that they are subject to the approval of the Governor.

■ We disagree. The section of the Stamp Act which authorizes the Secretary of the Interior to acquire waterfowl production areas also provides that they "may be acquired without regard to the limitations and requirements of the Migratory Bird Conservation Act." 16 U.S.C. § 718d(c). The paramount requirements of that Act are those which condition land acquisitions on state and gubernatorial consent. 16

U.S.C. §§ 715f and 715k–5. If the language in the Stamp Act exempting waterfowl production areas from the limitations and requirements of the Conservation Act is to have any meaning, it must be read as permitting the acquisition of those areas without the consent requirements. To find otherwise is simply to ignore the unambiguous language of the Stamp Act.

In this case approval has already been given for the acquisition of enough waterfowl easements to enable the Fish and Wildlife Service to meet its goals for waterfowl production areas in North Dakota. The state claims that this consent has been withdrawn. It argues that by approving acquisitions a Governor does not bind succeeding administrations and as a result the consent of one Governor may be revoked by another. Here it is contended that the county by county approvals given by Governor Guy between 1961 and 1964 did not extend beyond his term of office and that the acreage adjustments approved by Governor Link have been revoked.

■ While we hold that gubernatorial consent is not required for the acquisition of waterfowl production areas, it is clearly present here and cannot be revoked. To permit revocation would inject intolerable uncertainty into conservation planning and policy. It would subject every acquisition to the whim of changing state governments.

The Fifth Circuit Court of Appeals reached the same conclusion in *Swan Lake supra.* In that case the Governor of Mississippi unconditionally consented to the acquisition of lands to be added to the Yazoo National Wildlife Refuge. When the United States condemned land adjoining the refuge which belonged to the Swan Lake

---

11. N.D.Cent. Code 47–05–02.1 provides in relevant part:

> *Regulations governing easements, servitudes, or non-appurtenant restrictions on the use of real property.*—Real property easements, servitudes, or any non-appurtenant restrictions on the use of real property, which become binding after July 1, 1977, shall be subject to regulations contained in this section. These regulations shall be

deemed a part of any agreement for such interests in real property whether or not printed in a document of agreement.

1. * * *

2. The duration of the easement, servitude, or non-appurtenant restriction on the use of real property shall be specifically set out, and in no case shall the duration of any interest in real property regulated by this section exceed ninety-nine years.

Hunting Club, the Club produced a disclaimer from the Governor to the effect that he had not consented to the acquisition of the land by condemnation or to the acquisition of the hunting rights. Finding that condemnation was permissible under the Conservation Act,[12] the Court rejected the Governor's disclaimer: "In his letter of September 18 Governor Barnett consented . . . to the 'purchase' of the 'lands' in question; no limitation was placed on this broad language. . . . His disclaimer made nearly three years later cannot alter the legal effect of words uttered in 1960." 381 F.2d at 244–45.

In this case there has been no showing that any of the gubernatorial authorizations which have allegedly been withdrawn contained any contemporaneous reservations or limitations.[13] Accordingly, North Dakota cannot now complain that its prior approvals have been revoked or altered by the sub rosa intentions of the consenting officials.[14]

In short, the Stamp Act explicitly provides that waterfowl production areas may be acquired without state or gubernatorial consent. Whether required or not, consent is present here. A coherent waterfowl protection program is possible only when that consent is not subject to the belated conditions and revocations urged by the state.

*The Challenged North Dakota Statutes.*

The United States, through its treaty obligations with other nations, is committed to a policy of protecting migratory birds. That policy is implemented in part by federal statutes which preserve natural waterfowl habitat. State legislation which hinders or frustrates those statutes violates the Supremacy Clause Art. VI cl. 2 and cannot stand. *Nash v. Florida Industrial Comm'n.*, 389 U.S. 235, 240, 88 S.Ct. 362, 366, 19 L.Ed.2d 438 (1967). *See Little Lake Misere Land Co. v. United States*, 412 U.S. 580, 596–97, 93 S.Ct. 2389, 2398–2399, 37 L.Ed.2d 187 (1973).

In *United States v. Albrecht,* 496 F.2d 906 (8th Cir. 1974) the government sued to enforce a provision in a waterfowl production easement which prohibited draining or ditching on the land in question. The defendants argued that North Dakota law did not allow the specific type of easement conveyed to the United States. In requiring the Albrechts to comply with the terms of the easement, this Court observed that:

The specific federal governmental interest in acquiring rights to property for waterfowl production areas is stronger than any possible "aberrant" or "hostile" North Dakota law that would preclude the conveyance granted in this case. We fully recognize that laws of real property

12. See 381 F.2d at 240–41.

13. The authorization form for waterfowl easements signed by Governor Guy provides as follows:

I, William L. Guy, Governor of the State of North Dakota, in accordance with the provisions of the Act of October 4, 1961, 75 Stat. 813, hereby grant approval to the acquisition of easements by the United States of America of any lands within the county of _____, State of North Dakota, for Waterfowl Production Area purposes not to exceed _____ [a specified number of] acres of wetlands. Designated Record at 47 (Affidavit of William L. Guy ¶ 5).

There are certainly no restrictions in the above language.

North Dakota cites the following statement by Governor Link;

It is apparent . . . that the policy which I established on April 25, 1978, has been misinterpreted. For this reason, I must restate my policy in order to leave no room for a misun-

derstanding. The policy will be very simple: I will not approve any further wetlands acquisitions by the Fish and Wildlife Service, pursuant to 16 U.S.C. § 715k–5, until all mitigation and enhancement lands are acquired for the Garrison Diversion Unit.

Appellants Brief at 11. The policy referred to deals with future acquisitions; it does not even purport to terminate or limit prior acquisitions.

14. North Dakota directs our attention to the affidavit of Governor Guy which in part provides:

It was never my intention that the authorization would convey "full and unconditional approval to the Fish and Wildlife Service for the acquisition of . . . waterfowl easements." The authorizations were to be effective until modified or rescinded by me.

Designated Record at 47–48 (Affidavit of Governor Guy ¶ 7). But these reservations were not articulated at the time the authorizations were approved. See note 13 *supra*.

are usually governed by the particular states; yet the reasonable property right conveyed to the United States in this case effectuates an important national concern, the acquisition of necessary land for waterfowl production areas, and should not be defeated by any possible North Dakota law barring the conveyance of this property right.

496 F.2d at 911.

■ The North Dakota statutes challenged here are clearly hostile to the acquisition of waterfowl production areas by the United States. They place several conditions on the initial acquisition of waterfowl leases and easements and then set a limit on their duration. Among other things, the statutes require the Department of the Interior to reimburse the county for the cost of its impact analysis; permit landowners to negotiate the time period of leases and easements; and restrict all leases and easements to 99 years.[15] To the extent they encumber the federal statutes which provide for the acquisition of waterfowl habitat, the challenged North Dakota statutes are impermissible and must yield to the overriding national interest in protecting migratory birds.

*North Dakota's Counterclaim.*

■ The district court dismissed North Dakota's counterclaim for lack of subject matter jurisdiction. The counterclaim seeks to enjoin further land acquisitions both under the Conservation Act and with moneys from the migratory bird conservation fund without additional state consent. The only factual allegation is that the Fish and Wildlife Service intends to condemn additional land for the Lake Alice National Wildlife Refuge. This allegation is based on a letter to Governor Link from the area wildlife manager which discloses the planned condemnation.

Jurisdiction for the counterclaim is based on federal question 28 U.S.C. § 1331, the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 and the Administrative Procedure Act, 5 U.S.C. §§ 701–706. On appeal North Dakota concedes that standing alone section 1331 does not confer jurisdiction.[16] Appellants' Brief at 42. It argues, however, that when 1331 is considered along with section 702 of the APA there is a jurisdictional basis for its suit against the United States.[17] Section 702 provides in part:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensible party.

Assuming arguendo that North Dakota is correct,[18] the counterclaim was still properly dismissed in light of the relief granted the United States in its case in chief.

In addition, it would seem that under this record North Dakota's request for injunctive relief is premature. There is no allegation that the United States has commenced condemnation proceedings with respect to the Lake Alice area. In fact the letter indicating that suit would be filed also said that "(a)ny counteroffers received . . . will be carefully considered and every effort will be made to reach mutually acceptable agreements if at all possible." Designated Record at 56. We conclude that North Dakota's counterclaim was properly dismissed.

---

**15.** See notes 10 and 11 *supra.*

**16.** There is no serious contention that the declaratory judgment statute confers subject matter jurisdiction. *See Skelly Oil Co. v. Phillip Co.,* 339 U.S. 667, 671–72, 70 S.Ct. 876, 878–879, 94 L.Ed. 1194 (1950).

**17.** The general rule, of course, is that the United States as sovereign is immune from suit unless it consents to be sued. *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953–954, 47 L.Ed.2d 114 (1976).

**18.** *Compare Watson v. Blumenthal,* 586 F.2d 925, 932 (2nd Cir. 1978) and *Jaffee v. United States,* 592 F.2d 712, 718–19 cert. denied 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (3rd Cir. 1979).

The judgment of the district court is affirmed.