Andy MAHLER, Plaintiff,

v.

**UNITED STATES FOREST SERVICE;**
**James E. Denoncour, District Ranger,**
**Tell City District, Hoosier National For-**
**est; Floyd Marita, Regional Forester,**
**Eastern Region; Jack Ward Thomas,**
**Chief, Defendants.**

No. NA 95–0008–C H/H.

United States District Court,
S.D. Indiana,
New Albany Division.

May 7, 1996.

Order Denying Motion to Alter or
Amend June 7, 1996.

Andy Mahler, Paoli, Indiana, pro se.

Sue Hendricks Bailey, Office of United States Attorney, Indianapolis, Indiana, for defendants.

### MEMORANDUM OPINION ON MOTIONS FOR SUMMARY JUDGMENT

HAMILTON, District Judge.

The principal focus of this case is fifty acres of diseased and dying red pine trees in the Hoosier National Forest. The United States Forest Service has decided to "clear-cut" forty-six acres, to "shelterwood" cut another four acres, and to dispose of the timber in a salvage sale. Plaintiff Andy Mahler is a nearby resident and frequent visitor to the Hoosier National Forest. He seeks an injunction to stop the salvage operation, arguing that the Forest Service has violated the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. § 1600 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703 *et seq.* The Forest Service has lodged the relevant administrative records with the court and the parties have filed cross-motions for summary judgment. After review of the administrative record, the court finds that the defendants are entitled to summary judgment on all of Mahler's claims.

### The Challenged Decisions

Mahler's complaint seeks judicial review of two separate decisions. The first was the April 8, 1991, amendment to the Hoosier National Forest Land and Resource Management Plan ("1991 Plan Amendment"). The Land and Resource Management Plan, as amended in 1991, is a long-range strategic planning document that the Forest Service uses to guide all natural resource management activities for the Hoosier National Forest. See 36 C.F.R. § 219.4 (planning levels for Forest Service planning process); see generally *Sierra Club v. Robertson,* 28 F.3d 753, 758 (8th Cir.1994) (explaining role of forest plan). The 1991 Plan Amendment was adopted after review of a number of alternative management strategies. The amendment process provided for extensive public comment and included preparation of a full Environmental Impact Statement under NEPA. One major result of the 1991 Plan Amendment was to reduce by more than 40 percent the total scale of permitted timber harvest and sales within the Hoosier National Forest.[1]

The 1991 Plan Amendment established both forest-wide strategies and then more

---

1. Prior to the Plan Amendment, the Forest Service operated under a management plan that allowed annual sales of 11.5 million board feet.

The 1991 Plan Amendment reduced the allowable sale quantity to 4.4 million board feet per year. Record of Decision at 13.

specific forest management strategies for ten regions within the Hoosier National Forest called "Management Areas." In his complaint for judicial review, Mahler challenges the management prescription for Management Area 2.8, an area of more than 97,000 acres that includes the fifty acre stand of diseased red pine trees subject to the planned salvage operation. The 1991 Plan Amendment management prescription for Management Area 2.8 states, among other things, that forests in the area are suitable for timber production. Mahler contends that the management prescription for Management Area 2.8 was adopted without giving prior consideration to "potential effects on residual trees and adjacent stands" as required by 36 C.F.R. § 219.27(b)(4), and without assurance that it would "[p]rovide the desired effects on water quantity and quality, wildlife and fish habitat, regeneration of desired tree species, forage production, recreation uses, aesthetic values, and other resource yields," as required by 36 C.F.R. § 219.27(b)(6). Mahler filed a timely administrative appeal and exhausted his administrative remedies before seeking judicial review of the 1991 Plan Amendment in this action.

Second, Mahler challenges on many grounds the Forest Service's decision of June 10, 1994, authorizing the salvage sale of the fifty acres of pine trees specifically at issue here. The Red Pine Salvage Sale Decision Memo ("Decision Memo") authorized clearcutting of forty-six acres of red pine trees and shelterwood cutting of the other four acres.[2] The salvage project would produce a total volume of between 800,000 and 1,000,000 board feet of timber. Mahler filed an administrative appeal of the Decision Memo pursuant to 36 C.F.R. § 215. Under the applicable administrative appeal procedures, an "appeal reviewing officer" reviews the challenged decision and the appeal. See 36 C.F.R. §§ 215.17–215.19. The appeal reviewing officer then makes a recommendation to the "appeal deciding officer." In this case the appeal reviewing officer supported the underlying salvage decision but recommended remand for the limited purpose of building the record on mortality, opening and leave areas, and the use of a categorical exclusion under NEPA. The Regional Forester was the "appeal deciding officer" for this decision. He reviewed the original decision and the appeal reviewing officer's recommendation. He affirmed the Decision Memo's salvage plan and characterized the appeal reviewing officer's concerns as showing a desire for more information rather than a flaw in the decision under appeal. The appeal deciding officer found "the record contained adequate information which supported the decision." Administrative Record Document 11 at 1. After exhausting his administrative remedies, Mahler now seeks judicial review of the salvage decision.

## Standard of Review

■ This case comes before the court on the parties' cross motions for summary judgment. Where the court's task is to review an administrative record and apply legal standards to that record, summary judgment is an appropriate vehicle for deciding the case. See *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir.1994). The Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, sets forth the applicable scope of review for administrative decisions. Mahler relies on provisions requiring the reviewing court to:

> hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> \* \* \* \* \* \*
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

5 U.S.C. § 706(2)(A), (C). This standard requires the court to evaluate whether the decisions were based on a consideration of the relevant factors and whether there has

---

**2.** Clearcutting removes all merchantable trees from a unit of forest land at one time. Shelterwood cutting removes most of the timber volume from the unit while leaving designated trees to provide seed, shelter, and shade for regeneration.

After a new stand of timber has been established by natural seeding or planting, the remaining shelterwood trees can be harvested. See 1991 Plan Amendment for Hoosier National Forest, Appendix B at B–4 to B–5.

been a clear error of judgment by the administrative body. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). The court should make a searching and careful inquiry into the facts, but the court is not empowered to substitute its judgment for that of the agency. *Id.* On judicial review, district courts must give due deference to an agency's interpretations of its own regulations. See, *e.g., National Trust for Historic Preservation v. Dole,* 828 F.2d 776, 782 (D.C.Cir.1987).

■ The Seventh Circuit has applied the arbitrary and capricious standard when reviewing an agency's decision not to prepare an environmental impact statement. *State of Wisconsin v. Weinberger,* 745 F.2d 412, 417 (7th Cir.1984); *River Road Alliance, Inc. v. Corps of Eng'rs of U.S. Army,* 764 F.2d 445, 449 (7th Cir.1985). Decisions will be upheld under the arbitrary and capricious standard if they have been based on a consideration of the relevant factors and made on a rational basis. *Weinberger,* 745 F.2d at 417 (citations omitted). Based on the *Weinberger* and *River Road Alliance* decisions, this court will apply the arbitrary and capricious standard to defendants' decision to rely on a categorical exclusion under NEPA without undertaking a more elaborate environmental assessment of the planned red pine salvage operation.

### The Merits

### I. The 1991 Land and Resource Management Plan Amendment

■ Mahler argues that the Forest Service's 1991 Plan Amendment violates the National Forest Management Act's requirements concerning cutting methods for timber harvesting. The NFMA requires the Forest Service to adopt regulations specifying the guidelines for land management plans to:

insure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an evenaged stand of timber will be used as a cutting method on National Forest System lands only where—

(i) for clearcutting, it is determined to be the optimum method, and for other such cuts it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan.

16 U.S.C. § 1604(g)(3)(F). The 1991 Plan Amendment shows that the Forest Service complied with this requirement as applied to the land management plan process.

First, the Plan Amendment contains in Appendix B an extensive discussion of the rationale for deciding when the clearcut method of vegetative management would be optimal:

In clearcutting, with the exception of trees that may be left for wildlife or visual purposes, all merchantable trees on an area are harvested at one time. Unmerchantable trees are also felled to eliminate competition with the regeneration. Regeneration develops from natural seeding prior to harvests or sprouting from cut tree stumps. This regeneration method favors the establishment and development of species more intolerant of shade which are generally more desirable commercially. Clearcutting is the method that can slow the change from oak-hickory to the more mesic mixed hardwoods that is presently occurring on the Forest because of natural forces.

Clearcutting provides vegetation in an early successional stage. In an unmanaged situation this successional stage could be caused by wildfire, insects, diseases, or windthrow. Without manmade or natural disturbances, the forest tends to move toward a condition dominated by shade-tolerant, late successional vegetation such as sugar maple and beech. Clearcutting is an effective method used to obtain desirable natural regeneration in central hardwood stands although the regeneration of the oaks is still a problem. Clearcutting normally results in more seedlings and new sprouts than any other harvest method. Where regeneration of oak and hickory is of primary importance, advance reproduction of these species is essential prior to harvesting the overstory (Sander and Clark, 1971). Experience has also shown

that other factors such as site quality, aspect, and slope position affect the composition of natural regeneration. The oaks and hickories compete better on poor, dry sites with south and west exposure.

Clearcutting is especially appropriate for stands where the best trees have been removed in past harvests, or in areas which have insufficient trees to adequately use growing space.

Plan Amendment at B–5. The Plan Amendment then identifies more specifically the situations in which clearcutting may be "optimal":

Clearcuts will be used when they are the optimum harvest method to achieve our stated management objectives such as pine to hardwood conversions.

Clearcuts will be used to provide habitats for early successional species. This type of habitat is important to many forms of wildlife. Oak, tulip poplar, and cherry are the primary species which make up this habitat and are intolerant to intermediate in tolerance to shade. Where oak is the desired primary species in the future stand, at least 435 stems/acre of advanced oak-hickory regeneration should be present prior to overstory removal.

Clearcuts will be used to create openings and vistas, where potential for such areas exists and the vegetative composition and visual quality objectives can be met by such management.

Clearcuts will be used to remove high-risk and sparse stands and create vigorous, healthy young stands which will enhance overall age-class diversity. These stands can usually not be regenerated by any other means because they lack sufficient numbers of acceptable trees. Many of these stands are on good sites and are in their current condition due to past cutting practices. Once regenerated, they will provide improved wildlife habitat, scenic beauty, and high-quality timber.

*Clearcutting will also be used in areas so degraded by insects, disease or weather related damage that retaining any residual portion of the stand would be futile. Clearcutting will be used to reduce the spread of insect or disease outbreaks.*

Plan Amendment at B–6 to B–7 (emphasis added).

The NFMA does not prohibit clearcutting in national forests. The Act instead strikes a careful balance that allows clearcutting subject to certain substantive restrictions. At the level of forest-wide provisions of the 1991 Plan Amendment, the Forest Service complied with these requirements. See *Sierra Club v. Espy*, 38 F.3d 792, 798–800 (5th Cir.1994) (the NFMA permits even-aged management techniques where substantive standards are met); *Sierra Club v. Robertson*, 845 F.Supp. 485, 492–93 (S.D.Ohio 1994) (finding that a land and resource management plan containing very similar language complied with the NFMA and its optimality requirement).

Second, the Plan Amendment addresses the NFMA requirements on clearcutting through extensive discussions related to developing the management prescriptions for Area 2.8. The Guidance portion of the Plan Amendment for Area 2.8 notes that clearcutting may be used on a site-specific basis when it is considered the optimal method of harvesting, and then identifies situations where clearcutting may be considered optimal. Plan Amendment at 2–34. One of those circumstances, relevant to the red pine salvage sale, is conversion of pine stands to native hardwood stands. Hardwood stands are native to the Hoosier National Forest. However, pine stands were planted in the forest primarily in the 1940's and 1960's on abused, eroded farmland to hold the soil in place. The pines helped to rebuild the soil so that they can now support native hardwoods. Because pines are not native to the area, many of them are declining in health and are slowly dying. Document C–3 at 1.

■ Mahler argues that the Plan Amendment's Management Prescription for Area 2.8 violates regulations requiring the Forest Service to consider the effects on residual trees and adjacent stands. The pertinent regulations provide:

Management prescriptions that involve vegetative manipulation of tree cover for any purpose shall—

\* \* \* \* \* \*

(4) Be chosen after considering potential effects on residual trees and adjacent stands;

\* \* \* \* \* \*

(6) Provide the desired effects on water quantity and quality, wildlife and fish habitat, regeneration of desired tree species, forage production, recreation uses, aesthetic values, and other resource yields.

36 C.F.R. § 219.27(b)(4) & (b)(6). Mahler argues there is no indication in the administrative record of the 1991 Plan Amendment that the Forest Service considered potential effects on residual trees and adjacent stands or how the logging in Management Area 2.8 would provide the "desired effects." Mahler points out that Management Area 2.8 is the largest management area in the Hoosier National Forest, covering 97,232 acres. Final Environmental Impact Statement at 2–12.

The regulation does not prohibit clearcutting, shelterwood cutting, or timber production. Subsection (b)(4) requires consideration of effects on residual trees and adjacent stands, and subsection (b)(6) requires that management prescriptions provide the "desired effects," without specifying what effects should be "desired." Both the Plan Amendment and the Record of Decision reflect ample consideration of the factors required under section 219.27(b)(4) & (b)(6). The entire Record of Decision shows that the Forest Service balanced a host of sometimes conflicting goals and needs in formulating the overall Plan Amendment and the specific management prescriptions. See, e.g., Plan Amendment at 2–34. Those goals and needs deal with, among other factors, the items specified in section 219.27(b)(4) and (b)(6). In the context of Mahler's challenge, it is helpful to recall that the 1991 Plan Amendment imposed a 40 percent reduction in the total volume of timber harvesting permitted in the entire Hoosier National Forest.

The Forest Service also addressed its compliance with the regulation more specifically in preparing the Draft Environmental Impact Statement on the 1991 Plan Amendment. In Appendix B of the Draft Environmental Impact Statement, the Forest Service explained how it believed it had complied with the requirements of section 219.27, in-

cluding subsections (b)(4) and (b)(6). Appendix B shows that the Forest Service planned to consider effects on residual trees and adjacent stands by use of FORPLAN (a computer model for forest management), in development of the "Guidance" portions of the Land and Resource Management Plan, through monitoring of the forest, and, most important, through specific project development and planning. Draft Environmental Impact Statement at B6–6. As the Forest Service pointed out, compliance with some minimum management requirements, including such concerns as effects on residual trees and adjacent stands, requires site-specific analysis. The Plan Amendment provides for such consideration in planning specific projects, such as the red pine salvage sale at issue here. The Draft Environmental Impact Statement also identified the management tools that will be used to ensure continued compliance with (b)(4). The Guidance part of the Plan Amendment for Management Area 2.8 shows consideration of the requirements of (b)(4) as well as (b)(6). See Plan at 2–31 to 2–35. Mahler's apparent contention that more specific consideration was required is based on a misunderstanding of the required level of specificity in the Management Area prescriptions. The Plan Amendment need not consider the potential effects in detail for every tree in the entire forest. It is sufficient that the issues were considered as the Plan Amendment was developed and that the plan spelled out the means for ensuring that adequate consideration of these effects would be given in specific situations and projects.

To comply with the requirements of section 219.27(b)(6), the Plan Amendment also identified several sources of information, including Guidance, Appendices C, H, I, and K, and site-specific project development and planning. See Draft Environmental Impact Statement at B6–6. Guidance constitutes the heart of the management plan. The Plan Amendment includes forest-wide guidance and more specific guidance for each management area within the forest. Guidance provides the directions governing how and where management activities can take place. See Plan Amendment at 2–4. Plan Amendment Appendix C reviews in considerable

detail possible effects on endangered, threatened, and sensitive species. Plan Amendment Appendix I reviews management plans concerning the Forest's cave resources. Plan Amendment Appendix K reviews mitigation and protection measures for soil and water resources during and after construction of roads and other facilities.[3]

Management prescriptions are to be chosen after considering potential effects on the specified topics in 36 C.F.R. §§ 219.27(b)(4) & (b)(6). The administrative record as a whole shows that the Forest Service was considering the issues mandated by law in developing the Plan Amendment. The plan addresses those concerns and potential effects in its forest-wide strategies, in its more specific management prescriptions, and by specifying management practices to ensure careful consideration before site-specific actions are taken. Some effects cannot be considered in more detail at the relatively abstract level of the Plan Amendment in the absence of information specific to a site and project. The Forest Service complied with the National Forest Management Act in developing the Management Prescription for Management Area 2.8 of the Hoosier National Forest.

## II. The Red Pine Salvage Sale

Mahler raises several objections to the Forest Service's decision to conduct a salvage sale of fifty acres of red pine trees. First, Mahler argues the Forest Service's final decision approving the salvage sale was arbitrary and capricious because the appeal deciding officer's final decision relied on information in the record that Mahler says had nothing to with the actual red pine acreage slated for salvage. Second, Mahler asserts that the clearcutting decision violated 16 U.S.C. § 1604(g)(3)(F), the provision in the NFMA which allows the use of clearcutting only where it is "determined to be the optimum method ... to meet the objectives and requirements of the relevant land management plan." Third, Mahler asserts that the decision to use shelterwood cutting in part of the area also violated 16 U.S.C. § 1604(g)(3)(F), which allows use of this

even-aged technique only where it is "determined to be appropriate, to meet the objectives and requirements of the relevant land management plan." Fourth, Mahler contends that the red pine salvage sale decision violated NEPA because the Forest Service should not have used a "categorical exclusion" to satisfy NEPA requirements and because the Forest Service failed to give adequate consideration to other alternatives. Finally, Mahler argues the salvage decision was arbitrary, capricious, and contrary to law because the salvage operation will violate the Migratory Bird Treaty Act by causing the deaths of migratory birds.

## A. Reliance on the "Wrong" Information

■ Under Forest Service administrative procedures, Mahler pursued an appeal of the Forest Ranger's decision to go forward with the salvage sale. The first step in that process was review by the appeal reviewing officer. That official did not disagree with the decision to go forward with the salvage sale, but he recommended a remand to develop more information on mortality among the red pines, a better account of "opening and leave areas," and a better explanation of the reason for reliance on a categorical exclusion to comply with NEPA. The appeal deciding officer concluded that no remand was needed. On the mortality issue, he concluded that the record contained an adequate basis for determining the appropriate management techniques. He cited page 11 of Item B–1 of the project file and reports identified as F–1, F–2, and F–3 in the project file. Mahler contends that the decision was arbitrary and capricious because Document F–1 deals with shortleaf and Virginia pine, not the red pine at issue here; because document F–2 deals with pine sawfly infestation, not the pine beetles at issue here; and because he says Document F–3 actually supports Mahler's claims.

Document F–1 states that a forest health protection officer examined "several areas of pine" in the Forest, and that "these areas include short leaf and Virginia Pine." The

---

**3.** There is no Appendix H in the Plan Amendment.

two-page memorandum concludes with the assessment: "The general decline of pine seems confined mostly to short leaf and red pine." Document F–1 does indeed deal with red pine trees. The appeal deciding officer's reliance upon the document does not show that his decision was arbitrary and capricious.

Mahler correctly points out that Document F–2 deals with pine sawfly infestation; however, the document also reports that pine sawflies "commonly" feed on red pines. Document F–3 consists of a report designed to help develop management strategies for pine resources. With respect to red pine stands, the report observed that: (1) large pockets of mortality were present in a couple of tree stands; (2) evidence of two types of beetles and root rots was common; (3) subsequent environmental stress may cause the complete loss of the pine overstory in these stands; (4) one younger stand of red pine did not have serious pest problems, but problems are expected in the near future because this stand was overstocked. Document F–3 at 2. Mahler contends that this report's management recommendations support his position. The recommendations were qualified, however, and were presented alternatively, with their appropriateness depending on consideration of additional factors:

> Our silvicultural recommendations depend on the status of the hardwood understory and the composition of species. If the understory has advance regeneration of a desired species, the pine stand could be allowed to deteriorate without intervention, and a new hardwood stand will develop. However, if the composition of the understory is not desirable, silvicultural options include removal of the pine overstory with a controlled burn to kill the undesirable regeneration and to favor oak regeneration.

Document F–3 at 4. At most, this recommendation provides some qualified support for Mahler's view that the pine stands should be allowed to deteriorate on their own. It does not show that the Forest Service decision to the contrary was arbitrary and capricious.

## B. NFMA: Determination that Clearcutting was "Optimal"

Mahler also contends that the red pine salvage decision will violate the NFMA provision restricting the use of clearcutting. As discussed above, the NFMA imposes restrictions intended to make use of clearcutting more difficult for the Forest Service. The Act provides in relevant part that land management plans must:

> insure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an evenaged stand of timber will be used as a cutting method on National Forest System lands only where—
>
> > (i) for clearcutting, it is determined to be the optimum method, and for other such cuts it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan;
> >
> > \*　　\*　　\*　　\*　　\*　　\*
> >
> > (v) such cuts are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource.

16 U.S.C. § 1604(g)(3)(F).

In *Sierra Club v. Espy*, the district court issued a preliminary injunction halting the use of even-aged forest management techniques in national forests in Texas. 822 F.Supp. 356 (E.D.Tex.1993). That court determined that the NFMA "contemplates that even-aged management techniques will be used only in exceptional circumstances." 822 F.Supp. at 363–64. On appeal, the Fifth Circuit vacated the lower court's ruling, stating: "NFMA does not bar even-aged management or require that it be undertaken only in exceptional circumstances; it requires that the Forest Service meet certain substantive restrictions before it selects even-aged management." *Sierra Club v. Espy*, 38 F.3d at 800.

Referring to its earlier decision in *Texas Comm. on Natural Resources v. Bergland*, 573 F.2d 201 (5th Cir.1978), the Fifth Circuit noted: "We then cautioned the Forest Service that clearcutting could not be

justified merely on the basis that it provided the greatest dollar return per unit output; '[r]ather[,] clearcutting must be used only where it is essential to accomplish the relevant forest management objectives.'" *Sierra Club v. Espy,* 38 F.3d at 799 (quoting *Texas Comm. on Natural Resources v. Bergland,* 573 F.2d 201 (5th Cir.1978)). Mahler cites this language in support of his contention that the NFMA's optimality requirement means that clearcutting must be "essential" to be permissible. However, the same court also stated: "That even-aged management must be the optimum or appropriate method to accomplish the objectives and requirements set forth in an LRMP does not mean that even-aged management is the exception to a rule that purportedly favors selection management." *Sierra Club v. Espy,* 38 F.3d at 799. Mahler's argument reads too much into the language of the opinion in *Sierra Club v. Espy* and does not pay sufficient attention to the language of the statute enacted by Congress. The statutory language does not require that clearcutting be found "essential" to accomplish forest management objectives. The statute is deliberately worded in terms of an "optimum" technique. "Optimum" does not mean "essential." This carefully chosen language shows that Congress struck a "delicate balance" on this issue, see *Sierra Club v. Robertson,* 845 F.Supp. at 494, and the courts should not disrupt that balance by using words that Congress chose not to use.

The NFMA also sets forth the requirements for land and resource management plans for national forests. The Act provides that plans shall:

> (2) be embodied in appropriate written material, including maps and other descriptive documents, reflecting proposed and possible actions, including the planned timber sale program and the proportion of probable methods of timber harvest within the unit necessary to fulfill the plan.

16 U.S.C. § 1604(f)(2). The NFMA requires that proposed timber harvests be consistent with the relevant land management plan. 16 U.S.C. § 1604(i).

■ The red pine salvage sale decision complies with these requirements. The 1991 Plan Amendment states that Management Area 2.8 is suitable for timber production, balancing uneven-aged and even-aged systems, depending on site-specific characteristics and plant and animal habitat diversity needs. Plan Amendment at 2–33. The Plan then sets forth a number of requirements for timber harvest. Clearcut opening size for pine harvests must not exceed ten acres. Shelterwood cuts must not exceed ten acres. Openings must be of irregular shape, conform to the ecological unit, be varied to avoid uniformity of appearance, and be distributed for biological diversity, visual and site considerations. Plan Amendment at 2–34. "Guidance" for Management Area 2.8 states: "Young hardwood stands (0 to 9–year age class) are important as habitat for some plant and animal species and communities. In general, 4–12 percent of the area should be in these stands." Plan Amendment at 2–31. The salvage operation at issue here would facilitate conversion from diseased and aging pine stands to young native hardwood stands. The Guidance on harvesting trees from Management Area 2.8 says: "As trees are harvested to achieve desired plant and animal diversity and to provide forest products, the cutting method selected shall be based on the assurance that the technology and knowledge exist to adequately restock the lands within 5 years of harvest." Plan Amendment at 2–32. The Plan Amendment also provides that trees shall not be harvested within 250 feet of caves with significant bat populations. Plan Amendment at 2–32.

The Plan Amendment sets forth general guidelines for managing the entire forest. Individual management projects must comply with the Plan Amendment and must also comply with additional requirements that are set and satisfied on a site-specific basis. For example, the Plan Amendment explains that "[i]n some cases, compliance with minimum management requirements is dependent on site-specific situations and information. Although some general guidance has been developed to ensure these requirements are met, minimum requirements will be addressed in more detail through project plans and the application of site-specific guidance."

Draft Environmental Impact Statement at B6–4.

The Forest Service found expressly that clearcutting was the optimum harvest method for the red pine salvage sale. Substantial evidence supports the finding that the sale complies with the optimality requirement. The April 27, 1994, report prepared jointly by a silviculturalist, a fire specialist and a botanist recommended a clearcut salvage operation. The report noted that these experts had considered the environmental effects and concluded that only minimal adverse impacts would result. The Forest Service also conducted ground and aerial surveys and found widespread infestation, leaving the trees in a diseased and dying condition. Salvage cutting was recommended to halt the spread of infestation and to recover some useful timber before it was lost. The Forest Service determined that clearcutting was the optimum method to halt the spreading pine beetle infestation in the Forest.

While the regulations demonstrate that clearcutting should be used sparingly, other pertinent regulations require the Forest Service to protect all forest resources from depredations by forest pests. 36 C.F.R. § 219.1(b)(8). Moreover, the Plan Amendment states specifically that even-aged management practices may be applied to "[p]revent the spread of insect and disease damage or salvage losses from them." Plan Amendment at B–6. The optimality finding is consistent with the Plan Amendment, which states that clearcuts will be used "when they are the optimum harvest method to achieve our stated management objectives such as pine to hardwood conversions," and in "areas so degraded by insects, disease or weather related damage that retaining any residual portion of the stand would be futile." Plan Amendment at B–6 to B–7. The record indicates that both conditions are satisfied here. The appeal reviewing officer in the administrative appeal noted that the clearcutting decision was reasonable in light of the infestation problem and was made in accordance with Plan Amendment objectives; the appeal deciding officer noted that the record contained an adequate basis for the clearcutting decision; and the court agrees.

Mahler also argues that the Plan Amendment does not cover the sale outlined in the Decision Memo because that sale does not fit the Plan Amendment's definition of a salvage sale. The Plan Amendment defines "salvage" as follows: "Dead or dying trees which occur in excess of those needed for wildlife, aesthetics, or other purposes. These trees are harvested for production." Plan Amendment at A–31. Mahler argues that under this definition, "salvage" sales must be done for the purpose of timber production, not for insect control or disease control. The record shows that the red pine salvage operation was prompted by the presence of diseased and dying trees, and that the timber cut would be salvaged for production purposes. That is consistent with the Plan Amendment and management prescriptions. Mahler's argument assumes a false distinction between goals, benefits, and objectives, or assumes that the salvage operation can have only one purpose. By definition, salvage sales harvest dead and dying trees. It is not disputed that these red pine trees are diseased and dying.

## C. NFMA: Use of Shelterwood Cuts

The NFMA also restricts use of even-aged timber management techniques other than clearcutting, though its restrictions on those techniques, including shelterwood cuts, are less stringent. The Act provides in relevant part:

> shelterwood cutting, and other cuts designed to regenerate an evenaged stand of timber will be used as a cutting method on National Forest System lands only where—
>
> > (i) ... for other such cuts [including shelterwood cuts] it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan.

16 U.S.C. § 1604(g)(3)(F). While clearcuts must meet the higher "optimality" standard, shelterwood cuts must only meet the "appropriateness" standard.

██ On this record, the proposal to clearcut forty-six acres of diseased and dying red pine trees complies with the NFMA. Shelterwood cutting four acres would be a less

intrusive operation, removing most of the timber volume from the area while leaving designated trees to provide seed, shelter, and shade for regeneration. The Plan Amendment explains when shelterwood cuts are appropriate:

> The shelterwood method is most appropriate for tree species or sites where the shelter of a partial overstory is needed for reproduction, to give tree regeneration of high commercial value an advantage over species of lesser value *or where visual concerns warrant.*
>
> \* \* \* \* \* \*
>
> *The shelterwood method provides conditions favorable to regeneration of a wide variety of hardwood species* such as white oak, red oak, and white ash to name a few. The individual species favored depends on several physical and biological factors such as seed source, soil conditions, seedbed conditions, amount of shade, and microclimatic conditions at the forest floor.
>
> \* \* \* \* \* \*
>
> *Shelterwoods will be used to regenerate softwoods and hardwoods,* especially where oak is the desired species. The density of residual stocking will be determined by species composition objectives (tolerant vs. intolerant), visual quality objectives, and condition of the stand before cutting.

Plan Amendment at B–4 to B–6 (emphasis added). The management prescription for Management Area 2.8 reflects a concern for visual effects:

> Woody debris resulting from timber harvest will receive special treatment along the visual foreground of frequently traveled roads, trails and streams to meet the visual quality objective.

Plan Amendment at 2–32. The Forest Service decided to use the shelterwood cut method in the salvage operation due to visual concerns:

> A small, 4 acre, shelterwood area will also be marked next to the French Ridge Road to break up the amount of temporal open-

ing along the road. For visual considerations, the shelterwood method will be used along the roads (except the Terry Road). The hardwood component will be left as part of the residual stand in all stands.

Document B–1 at 12.[4] Pertinent regulations require that management prescriptions provide the desired effects on aesthetic values. 36 C.F.R. § 219.27(b)(6). Since the NFMA would permit the Forest Service to clearcut the entire fifty acre area at issue, the NFMA would clearly permit the Forest Service to address visual concerns by using the less intrusive shelterwood cut method on four of the fifty acres. Mahler's argument that the decision is inadequate because it does not explain why clearcutting will be used along one road but not along others comes close to asking the court to review the Forest Service's plan on a tree-by-tree basis. The planned use of shelterwood cuts does not violate the NFMA.

### D. NEPA Requirements

**1. Categorical Exclusion:** Regulations implementing NEPA establish a three-tiered system for evaluating environmental management decisions: environmental impact statements, environmental assessments, and categorical exclusions. Environmental impact statements, the most elaborate system for evaluation, must be prepared for "major federal actions significantly affecting the quality of the human environment." 40 C.F.R. § 1502.3. Defendants prepared an environmental impact statement in conjunction with the 1991 Plan Amendment. Mahler does not challenge the validity of that environmental impact statement, nor does he argue that NEPA required an environmental impact statement before the 50 acre salvage sale could be undertaken.

Mahler argues, however, that NEPA required defendants to prepare an environmental assessment before making the salvage decision. Environmental assessments are concise public documents that provide analysis for determining whether to prepare an

---

**4.** Leaving the hardwoods as part of the residual stand furthers the goal of pine to hardwood con- versions.

environmental impact statement or a finding of no significant impact on the environment. 40 C.F.R. § 1508.9. An environmental assessment must include discussions on the need for the proposal, other alternatives, the environmental impact of the proposal and its alternatives, and other information. *Id.* A finding of no significant impact must present the reasons why an action not otherwise excluded as a categorical exclusion will not necessitate an environmental impact statement. 40 C.F.R. § 1508.13.

To prevent the environmental assessment process under NEPA from becoming unnecessarily burdensome, NEPA regulations allow agencies to adopt "categorical exclusions." The regulations define categorical exclusion as follows:

> "Categorical Exclusion" means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in § 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

40 C.F.R. § 1508.4.

The red pine salvage sale would include clearcutting of forty-six acres of red pine and shelterwood cutting of four acres of red pine for an estimated volume of between 800,000 to 1,000,000 board feet. Decision Memo at 1. The Forest Service did not conduct an environmental assessment of the planned red pine salvage sale. The Decision Memo relied instead on a Forest Service categorical exclusion for small-scale salvage sales:

> Timber harvest which removes 250,000 board feet or less of merchantable wood products or salvage which removes 1,000,-000 board feet or less of merchantable wood products; which requires one mile or

less of low standard road construction (Service level D, FSH 7709.56); and assures regeneration of harvested or salvages areas, where required.

1909:15 Forest Service Handbook § 30, page 6 of 10. The Handbook also sets forth those extraordinary circumstances that would require an environmental assessment. Extraordinary circumstances include steep slopes or highly erosive soils; threatened and endangered species or their critical habitat; and flood plains, wetlands or municipal watersheds. 1909.15 Forest Service Handbook § 30, page 1 of 10.

 Mahler argues that the Forest Service did not properly rely on the categorical exclusion here. First, relying on the last sentence in 40 C.F.R. § 1508.4, he argues that the Forest Service failed to make a proper finding that no extraordinary circumstances exist. Second, Mahler argues that extraordinary circumstances were in fact present in the salvage area. He contends the area has steep slopes, highly erosive soils, floodplains, and migratory songbirds. None of these arguments demonstrate that the Forest Service's decision was arbitrary and capricious or otherwise unlawful.

The Decision Memo, written by Tell City District Ranger James E. Denoncour, states: "I find that there are no extraordinary circumstances or effects that will significantly affect the environment." Mahler takes exception to Denoncour's use of the word "significantly." He argues that extraordinary circumstances do not have to be "significant" to render an environmental assessment necessary. This argument lacks merit. The NEPA regulation requires categorical exclusions to provide for "extraordinary circumstances in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4. The finding in the Decision Memo did not evade the requirements of the regulation.

Next, Mahler argues that an environmental assessment was required for the salvage sale because he contends the record in fact shows that extraordinary circumstances exist in the area slated for the salvage operation. Mahler points to steep slopes and highly

erosive soils, floodplains, and migratory songbirds [5] as examples of extraordinary circumstances requiring the preparation of an environmental assessment. Mahler claims that because maps in the administrative record show several streams in the project area, there must also be floodplains in the area. Mahler argues:

> The maps included in the Administrative Record show several streams in the project area that have lowlands and relatively flat areas next to the stream. All streams flood sometimes, so there has to be a floodplain associated with the creeks.

Plaintiff's Opening Brief at 21. Mahler cites the maps in the administrative record and offers no further support for this argument. The presence of streams does not establish the presence of floodplains in the area. That would depend on the specific topography.

Mahler also argues that the presence of steep slopes and highly erosive soils should render use of a categorical exclusion arbitrary and capricious. The April 27, 1994, analysis undertaken by a botanist, silviculturalist, and fire specialist describes the site as follows:

> Topographically, much of the area is flat narrow ridges with gentle slopes. The majority of the soil is a Wellston silt loam with 2–6 percent slopes; and has a south aspect with a slight to moderate erosion hazard. Surface runoff is medium.

Document B–1 at 1–2. Mahler takes exception to the words "much" and "majority." He argues, "the entire area, not just most or the majority of it, must be taken into account." Pl.'s Opening Brief at 20. However, nothing in this document suggests that the Forest Service only considered most or the majority of the area. Rather, this language merely suggests generalized conclusions reached after completing the required soil analysis.

In addition, the challenged memo notes that during the scoping process the Soil Conservation Service determined that the proposal would not cause soil erosion. Document B–1 at 4. Mahler questions this as-

sessment. He claims that the administrative record contains no record of communication with the Soil Conservation Service. Mahler acknowledges that the decision documentation cites a Perry County soil survey undertaken by the United States Department of Agriculture Soil Conservation Service from 1969. Document B–1 at 9. Mahler has not explained why the 1969 soil survey results should be discounted. Instead, Mahler argues that the reference to the soil conservation service pertains to a letter from the Board of Supervisors of the Perry County Soil and Water Conservation District. That letter states:

> In our opinion the harvest of pine timber and the thinning of white pine would be beneficial to the forest ecosystem. In addition the proposed treatment should not create a soil erosion problem or damage the environment.

Document E. Mahler argues that the letter merely communicated a public opinion held by elected officials, not soil scientists. He also points out that their comment does not rule out soil erosion. If this letter provided the only support for the Forest Service's conclusion that "highly erosive soils" do not present an extraordinary circumstance related to this project, then Mahler might have a valid argument. However, this letter forms just one small piece of a record that is relatively voluminous (at least in view of the modest action contemplated). In light of the information in the record supporting the conclusion that highly erosive soils are not found in the project site, the Forest Service properly applied a categorical exclusion here.

**2. Consideration of Alternatives:** Mahler also argues that the Forest Service violated NEPA by failing to give adequate consideration to reasonable alternatives to the salvage plan it adopted. Mahler contends that the Forest Service should have considered using shelterwood cuts in the forty-six acres slated for clearcutting. He also argues that the Forest Service should have considered using uneven-aged management tech-

---

**5.** Mahler's songbird argument relates to his MBTA count, which will be addressed separately. He argues that the killing of migratory songbirds would violate the MBTA, thus creating the extraordinary circumstance of violation of other laws.

niques to deal with the infested and diseased red pines.

The categorical exclusion mechanism was designed to eliminate the need to investigate alternatives when the environmental impact of a proposed action would be minimal. The regulations indicate that when a categorical exclusion applies an agency *may* decide to consider alternatives, but it is *not required* to do so. See 40 C.F.R. § 1508.4. Categorical exclusions apply to management decisions that simply do not require the level of analysis necessary for compliance with environmental assessment or environmental impact statement regulations. Environmental assessment regulations include a requirement for "brief discussions of the need for the proposal, of alternatives. . . ." 40 C.F.R. § 1508.9. The consideration of alternatives requirement simply does not apply to categorical exclusions.

### E. MBTA Provisions

Mahler also argues that the Forest Service's salvage decision violates the Migratory Bird Treaty Act. The MBTA provides in relevant part:

> it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, . . . any migratory bird, any part, nest, or egg of any such bird . . .

16 U.S.C. § 703. Mahler argues that the red pine salvage sale would cause a "taking" of migratory birds that would violate the MBTA.

▪ The Forest Service argues that the court lacks subject matter jurisdiction over the MBTA claim because the MBTA is essentially a criminal statute with criminal penalties, see, *e.g., United States v. Smith,* 29 F.3d 270 (7th Cir.1994); *United States v. Van Fossan,* 899 F.2d 636 (7th Cir.1990), and because it contains neither an express nor an implied citizen suit provision, see 16 U.S.C. §§ 703–712; see also *Defenders of Wildlife v. Administrator, EPA,* 882 F.2d 1294, 1302–03

(8th Cir.1989). The Forest Service notes correctly that MBTA enforcement decisions are committed to agency discretion. See, *e.g., Heckler v. Chaney,* 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); *Alaska Fish & Wildlife Fed'n v. Dunkle,* 829 F.2d 933, 938 (9th Cir.1987); see also *Defenders of Wildlife,* 882 F.2d at 1301. These facts, however, do not deprive the court of subject matter jurisdiction over Mahler's claim that the salvage sale would violate the MBTA. Mahler is not seeking to enforce the MBTA against a private individual or entity. Instead, he invokes the Administrative Procedures Act, which requires a reviewing court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). No stretching of statutory language is needed to conclude that a federal agency's decision to take action that would violate the MBTA would be "otherwise not in accordance with law."

The issue, therefore, is whether the planned harvest of red pine trees would constitute a "taking" of migratory birds. Defendants concede that migratory birds could be nesting in the stands designated for harvest.[6] Mahler argues that the red pine salvage project would indirectly "take" migratory birds by destroying their habitat. Moreover, Mahler argues that logging during nesting season would directly "take" migratory birds.

▪ Habitat destruction and logging during nesting season do not produce "takings" of migratory birds within the purview of the MBTA. The MBTA's implementing regulations define "take" as follows:

> to pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect.

50 C.F.R. § 10.12. Mahler's "indirect taking" argument has been addressed by other courts. As explained by the Ninth Circuit, the statutory definition of "take" describes "physical conduct of the sort engaged in by

---

**6.** The appeal deciding officer considered possible effects on migratory bird species, including information submitted by Mahler. The appeal deciding officer noted that "the evaluation determined that the project would have no discernible effect on bird species." Administrative Record Document 10 at 5.

hunters and poachers, conduct which was undoubtedly a concern at the time of the statute's enactment in 1918." *Seattle Audubon Soc'y v. Evans,* 952 F.2d 297, 302 (9th Cir.1991). The MBTA and regulations promulgated under it make no mention of habitat modification or destruction. *Id.* The *Evans* court noted that the Endangered Species Act used broader language to define "take," incorporating the words, "harm" and "harass." *Id.* at 303. The court held that habitat destruction in the form of logging causes "harm" under the Endangered Species Act but does not "take" birds within the meaning of the MBTA. *Id.* Cf. *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* —— U.S. ——, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (interpreting Endangered Species Act).[7]

While the Seventh Circuit has not addressed the "direct taking" issue, other courts have adopted the same reasoning when asked to apply the MBTA to logging operations. In *Citizens Interested in Bull Run, Inc. v. Edrington,* the court rejected an MBTA claim designed to halt a logging operation in Mt. Hood National Forest. 781 F.Supp. 1502 (D.Ore.1991). The court stated:

> I find that the proposed timber sale does not constitute a "taking" of migratory birds within the meaning of the MBTA. I further find that the Act was intended to apply to individual hunters and poachers, ... a "taking" under the MBTA does not include habitat modification resulting from Forest Service sales activity.

*Id.* at 1510; accord *Portland Audubon Soc'y v. Lujan,* 21 Envt'l L.Rep. (CCH) ¶ 21,341; 1991 WL 81838 (D.Ore. May 8, 1991); *Seattle Audubon Soc'y v. Robertson,* Nos. 89–160WD, C89–99(T)WD, 1991 WL 180099

(W.D.Wash. Mar. 7, 1991) (timber sales did not constitute a "taking" under the MBTA).[8]

Congress adopted the MBTA in 1918, with the stated purpose of implementing a treaty between the United States and Great Britain "for the protection of the 'many species of birds [which] in their annual migration traverse certain parts of the United States and Canada.'" *United States v. North Dakota,* 650 F.2d 911, 913 (8th Cir.1981) (quoting Migratory Bird Treaty Act, 39 Stat. 1702). Generally, the MBTA proscribes the hunting, capture, possession, and sale of migratory birds. *North Dakota,* 650 F.2d at 913. "On its face, the comprehensive statutory provision is naturally read as forbidding transactions in all bird parts ..." *Andrus v. Allard,* 444 U.S. 51, 60, 100 S.Ct. 318, 324, 62 L.Ed.2d 210 (1979). The MBTA was designed to forestall hunting of migratory birds and the sale of their parts. The court declines Mahler's invitation to extend the statute well beyond its language and the Congressional purpose behind its enactment.

### Conclusion

The Forest Service complied with the NFMA and NEPA when it adopted the 1991 Plan Amendment and when it decided to conduct the red pine salvage sale. The red pine salvage operation would not result in a "taking" of migratory birds under the MBTA. The Forest Service's motion for summary judgment is therefore GRANTED, Mahler's motion for summary judgment is DENIED, and Mahler's claims will be dismissed on the merits. Judgment will be entered immediately.

### ENTRY ON PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT

After the court entered final judgment for defendants in this case, plaintiff Andy Mah-

---

**7.** Mahler relies on *Sierra Club v. USDA,* in which the court held that habitat destruction did not constitute a "taking" under the MBTA, but did not decide whether a logging operation during nesting season would violate the MBTA:

> The Forest Service has failed to respond to this [MBTA] argument in any meaningful way ... the Court finds that the Forest Service has not adequately addressed the issue of whether the [Amended Land Resource Management Plan] will violate the MBTA ...

No. 94–CV–4061–JPG (unpublished decision) (S.D.Ill. Sept. 25, 1995). The court's request for

further information from the Forest Service in that case does not support Mahler's argument.

**8.** Mahler cites *United States v. Corbin Farm Serv.,* 578 F.2d 259 (9th Cir.1978), and *United States v. FMC Corp.,* 572 F.2d 902, 904–06 (2d Cir.1978), on this point. As the Ninth Circuit pointed out in *Seattle Audubon Society v. Evans,* both of those cases involved "direct, though unintended, bird poisoning from toxic substances." 952 F.2d at 303. They do not extend the language of the MBTA to habitat destruction that may lead indirectly to bird deaths. *Id.*

ler asked the court to reconsider his arguments about the scope of the Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.* His argument is supported by a new decision from the Northern District of Georgia issued the day after this court entered judgment for defendants. With this new support, plaintiff's "motion to reconsider" deserves careful consideration on the merits, for he has put his finger on a problem concerning the scope of the Migratory Bird Treaty Act that has troubled courts for many years.

## Background

The subject of this case is fifty acres of diseased and dying red pine trees in the Hoosier National Forest. The United States Forest Service decided in 1994 to "clearcut" forty-six acres, to "shelterwood" cut another four acres, and to dispose of the timber in a salvage sale. Plaintiff Mahler is a nearby resident and frequent visitor to the Hoosier National Forest. He brought this action seeking declaratory and injunctive relief to stop the salvage operation, arguing that the Forest Service violated the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. § 1600 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703 *et seq.* On May 7, 1996, the court granted defendants' motion for summary judgment, denied plaintiff's motion for summary judgment, and entered final judgment for defendants.

■■■ On May 15, 1996, Mahler, a *pro se* litigant, filed his "Motion for Reconsideration." [1] He relied upon Fed.R.Civ.P. 59(e), which governs motions to alter or amend judgment. Motions filed under Federal Rule of Civil Procedure 59(e) "may only be granted if there has been a mistake of law or fact or new evidence has been discovered that is material and could not have been discovered

previously." *Figgie Int'l, Inc. v. Miller,* 966 F.2d 1178, 1180 (7th Cir.1992). Mahler has not cited any new evidence that is material and could not have been discovered earlier.[2] His sole argument in support of his Rule 59(e) motion is that the court made a mistake of law by deciding that the red pine salvage operation would not violate the MBTA. Mahler relies primarily upon a May 8, 1996, decision from the Northern District of Georgia holding that harvesting trees during nesting season would violate the MBTA. *Sierra Club v. Martin,* slip op., No. 96–CV–926–FMH (N.D.Ga. May 8, 1996) (granting preliminary injunction under MBTA to delay timber harvest in national forest).

For purposes of his Rule 59(e) motion, Mahler does not dispute the court's decision to grant summary judgment to defendants on his NEPA and NFMA claims. Mahler asks the court to alter its judgment on the claim brought under the Administrative Procedure Act (APA) to prevent what he contends is an imminent violation of the MBTA. The APA requires reviewing courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). Mahler argues that if the red pine salvage operation is conducted during nesting season for migratory songbirds, it would violate the MBTA's prohibition of "taking" any protected migratory bird species, or their nests, eggs, or parts. Mahler believes that harvesting trees during nesting season would cause "direct takings" of migratory songbirds in violation of the MBTA. Mahler also argues that "[t]o comply with the MBTA, the Forest Service has only to avoid cutting the sale while the migratory birds are nesting." (Pl. Reply Brief at 11)

The MBTA is a criminal statute. It provides in relevant part:

---

1. Although Mahler has represented himself in this proceeding, his briefs and other filings in this case reflect great familiarity with the subject matter of some relatively complex legal issues, as well as up-to-the-minute legal research that includes several important unpublished decisions.

2. In support of his motion to alter or amend judgment, Mahler also submitted an affidavit signed by Dr. Donald Whitehead and Mr. Donald Winslow on May 9, 1996. Defendants have

moved to strike the affidavit of Whitehead and Winslow. The court agrees that in this proceeding for judicial review, the factual record on the merits must be confined to the voluminous administrative record compiled by the United States Forest Service. See *Cronin v. United States Dep't of Agric.,* 919 F.2d 439, 444 (7th Cir.1990). Defendants' motion to strike is therefore GRANTED.

it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, ... any migratory bird, any part, nest, or egg of any such bird....

16 U.S.C. § 703. The MBTA authorizes employees of the Department of Interior to enforce its provisions by arresting violators, executing warrants, and searching premises under warrant. 16 U.S.C. § 706. The statute contains both felony and misdemeanor provisions. 16 U.S.C. § 707. The MBTA's implementing regulations define "take" as follows:

to pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect.

50 C.F.R. § 10.12.

The list of birds now protected as "migratory birds" under the MBTA is a long one, including many of the most numerous and least endangered species one can imagine. Although the MBTA initially protected only a small number of birds, in 1971, the Secretary of the Interior expanded its coverage to apply to nearly all birds indigenous to the North America, including the wren, robin, crow, chickadee, oriole, sparrow, warbler, blackbird, bluebird, and many others. 50 C.F.R. § 10.13. See also *United States v. Van Fossan*, 899 F.2d 636, 637–39 (7th Cir. 1990) (noting that common grackle and mourning dove are protected, and that measures used to kill pests "are bound to kill an occasional migratory bird"). In 1974, Congress amended the MBTA to cover "products" of birds or bird parts, nests, and eggs. See 16 U.S.C. § 703; Sen.Rep. No. 851, 93rd Cong., 2d Sess. 3 (1974), *reprinted in* 1974 U.S.C.C.A.N. 3250, 3252.

As discussed in this court's original opinion, several courts have interpreted the MBTA in connection with logging operations. Those courts have uniformly held that habitat destruction or modification, including change that results from logging operations, does not violate the MBTA. See, *e.g.*, *Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 302 (9th Cir.1991); *Citizens Interested in Bull Run, Inc. v. Edrington*, 781 F.Supp. 1502,

1510 (D.Ore.1991); *Portland Audubon Soc'y v. Lujan*, 21 Envt'l L.Rep. (CCH) ¶ 21,341; 1991 WL 81838 (D.Ore. May 8, 1991); *Seattle Audubon Soc'y v. Robertson*, Nos. 89–160WD, C89–99(T)WD, 1991 WL 180099 (W.D.Wash. Mar. 7, 1991).

At least for purposes of his Rule 59(e) motion, Mahler does not question the correctness of these decisions. Instead, he tries to limit the holdings of those cases by distinguishing between what he calls "indirect takings" in the form of "habitat modification" (which the MBTA does not prohibit) and what he calls "direct takings," which he argues will occur if trees with active nests are cut down (and which he argues the MBTA does prohibit). Mahler acknowledges that all logging operations result in habitat modification, but he argues that logging operations conducted during nesting season are different because nests, eggs, and juvenile birds that cannot fly away will be destroyed.

### Applicability of the MBTA

The specific issue here is whether the MBTA applies to logging operations in national forests where those logging operations are not intended to cause the death or capture of birds. More generally, the issue is whether the MBTA applies to a wide range of human activity that may incidentally and unintentionally cause the death of migratory birds. After considering the statutory language and amendments, available legislative history, case law under the MBTA, related legislation, and the history of the MBTA's application since its enactment in 1916, the court concludes that the MBTA will not be violated by the planned salvage logging activity in the Hoosier National Forest, even during nesting season.

Mahler's argument for broad application of the MBTA admittedly draws substantial support from the statutory language and from case law developed in criminal cases brought by agencies of the United States government other than the Forest Service. The statutory language says, after all, that it is "unlawful at any time, *by any means or in any manner*, to ... kill ... any migratory bird." 16 U.S.C. § 703 (emphasis added). Mahler also relies on two cases that applied the

criminal provisions of the MBTA to private businesses whose pollution caused the deaths of migratory birds, even though the deaths were not intentional. See *United States v. Corbin Farm Service*, 444 F.Supp. 510 (E.D.Cal.1978) (deciding pretrial motions), *aff'd after convictions*, 578 F.2d 259 (9th Cir.1978), and *United States v. FMC Corp.*, 572 F.2d 902 (2d Cir.1978).

*Corbin Farm Service* was a criminal prosecution of a business and individuals who applied a toxic pesticide to an alfalfa field inhabited by migratory birds. The district court ruled that the defendants could be charged under the MBTA without proof of intent to kill migratory birds. 444 F.Supp. at 535-36. (The court commented, however, that if the defendants "acted with reasonable care or if they were powerless to prevent the violation, then a very different question would be presented." 444 F.Supp. at 536, citing *United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 84 S.Ct. 559, 11 L.Ed.2d 536 (1964).) In *FMC Corp.*, the Second Circuit affirmed criminal convictions of the defendant corporation for violating the MBTA after toxic chemicals were released from its pesticide manufacturing plant into a wastewater pond, resulting in the deaths of many migratory birds. The court held that the jury had properly been instructed that it should convict even if the deaths of the birds were accidental or unintentional. 572 F.2d at 904-06.

Mahler's argument is also squarely supported by *Sierra Club v. Martin*, slip op. 96–CV–926–FMH (N.D.Ga. May 8, 1996), in which the court issued a preliminary injunction to halt logging operations in the Chattahoochee and Oconee National Forests in Georgia through September 15, 1996, after the nesting season in Georgia ends. On a motion for preliminary injunction, the court had to determine whether the plaintiffs had a reasonable likelihood of success on the merits of their MBTA claim. The court explained:

> The Court finds that a taking or killing does not occur simply because of habitat destruction or modification. In this case, however, a killing of young migratory birds occurs because Defendants are allow-

ing tree cutting and logging during nesting season.

*Id.* at 8 (citations omitted). In its analysis of this issue, the court noted that the Forest Service in the Georgia case did not contest the fact that tree cutting during nesting season kills migratory birds, nor did it apparently dispute the claim that such results would violate the MBTA. Instead, the Forest Service in that case directed its arguments to issues of subject matter jurisdiction, availability of a private right of action, standing requirements, and available forms of relief under the MBTA. The court rejected each of the Forest Service's arguments, at least for purposes of the preliminary injunction.

At least in the criminal prosecutions in *FMC Corp.* and *Corbin Farm Service*, the United States government has taken essentially the position argued by Mahler here: that the MBTA applies to unintended deaths of migratory birds caused by human action (and even inaction). As the district court commented in *Corbin Farm Service*, "The United States responds that knowledge of the birds and intent to affect birds is *irrelevant* and that the Act permits conviction of *any person whose actions result in the death of birds.*" 444 F.Supp. at 534 (emphasis added). The case law also supports the view that the MBTA is violated by the death of a single migratory bird subject to its protection. *E.g., Corbin Farm Service*, 444 F.Supp. at 529-31.

Under this view of the MBTA, a person who causes the death of a single migratory bird or breakage of a single egg is guilty of a federal misdemeanor crime. This is so even if the defendant did not know of the MBTA, even if the defendant's actions were not intended to kill or capture birds, and even if the defendant did not know his or her actions would or might result in the deaths of birds. This degree of solicitude for the life of every sparrow has deep roots, of course, in Western civilization. See, *e.g., Matthew* 10:29 ("Are not two sparrows sold for a penny? And not one of them will fall to the ground without your Father's will."); *Luke* 12:6. Yet the criminal law ordinarily requires proof of at least negligence before a person can be held criminally liable for causing the death of

another human being. Mahler's approach to the MBTA would impose criminal liability on a person for the death of a bird under circumstances where no criminal liability would be imposed for even the death of another person.[3]

Thus, a homeowner who cuts down a dead tree, not knowing that it contains an active nest of migratory birds, or perhaps just a single egg in a nest invisible from the ground, commits a federal crime. Or consider birds that nest on the ground. Suppose a farmer runs over a nest or two when she mows the hay in a field? Under Mahler's strict liability approach, the same result holds. As Judge Easterbrook observed for the Seventh Circuit: "Can it be that the Migratory Bird Treaty Act condemns as criminal anyone who takes (effective) steps to rid his land of pigeons carrying histoplasmosis? The answer is 'yes' if, as other circuits hold, the Migratory Bird Treaty Act establishes a strict liability offense." *Van Fossan,* 899 F.2d at 639. (The *Van Fossan* court left the issue of intent open, as did another panel of the Seventh Circuit in *United States v. Smith,* 29 F.3d 270, 273 (7th Cir.1994).)

Under this approach, giving full sweep to the statutory phrase "by any means or in any manner ... kill" and to the apparent lack of a *scienter* element in at least the misdemeanor provisions of the MBTA, it is easy to conclude that logging a forest during nesting season is highly likely to result in the commission of federal crimes. That is the conclusion reached, at least on a preliminary basis, in *Sierra Club v. Martin.*[4]

In responding to these arguments, the Forest Service has had a difficult time. It is apparently unwilling to disavow the holdings of *FMC Corp.* or *Corbin Farm Service,* yet it cannot accept the reasoning of those cases as applied to logging activities. To avoid this dilemma, the Forest Service has tried hard in this case and in *Sierra Club v. Martin* to provide a path for the courts to rule in its favor without deciding whether logging that kills migratory birds violates the MBTA. In both cases the Forest Service has tried to portray the MBTA claims as attempts to bring "private" actions under the MBTA, which the statute quite clearly does not allow. And in both cases the Forest Service has tried to argue that no one other than the United States government may invoke the MBTA.

No one other than the United States government may invoke the criminal penalties of the MBTA, of course, but the issue raised by the government's attempts to avoid the merits in this case is whether the government must comply with its own criminal laws. The Forest Service's solution to this apparent dilemma · is troubling. Reading together *FMC Corp., Corbin Farm Service,* and the Forest Service's briefs in this case, one would conclude that Congress has written a very broad statute—one that imposes strict criminal liability for even the unintentional death of any single bird from a vast number of species, so long as that death results from human action. Although the courts in those cases expressed some misgivings about giving the statute such a broad reading (the *FMC Corp.* court said, for example, that that result "would offend reason and common sense"), those courts left any meaningful limitations on the scope of the statute to "the sound discretion of prosecutors and the courts." See *FMC Corp.,* 572 F.2d at 905.

---

3. Congress amended the MBTA in 1986 to add a knowledge requirement for felony violations. See 16 U.S.C. § 707(b). The Senate Report discussing this amendment explains that the amendment "will require proof that the defendant knew (1) that his actions constituted a taking, sale, barter, or offer to sell or barter, as the case may be and (2) that the item so taken, sold, or bartered was a bird or portion thereof." Sen.Rep. No. 445, 99th Cong., 2d Sess. 16 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6113, 6128. The statutory knowledge requirement is not contained in the provision for criminal misdemeanor charges. See 16 U.S.C. § 707(a).

4. In *Sierra Club v. United States Department of Agriculture,* No. 94–CV–4061–JPG (S.D.Ill. Sept. 25, 1995), Judge Gilbert considered an argument similar to Mahler's in this case. Judge Gilbert noted that the Forest Service had failed to respond to the argument. He remanded the matter to the Forest Service on other grounds and directed the Forest Service to consider more fully whether the MBTA would be violated by logging in the national forest during nesting season. Slip op. at 35.

Prosecutorial discretion is a familiar and indispensable element of the criminal justice system. But by failing to attempt to attack or distinguish *FMC Corp.* or *Corbin Farm Service* in this case, the federal government is saying in effect that the literal reach of the MBTA is so obviously unreasonable that the government itself cannot possibly be expected to obey its own law. Yet the government would require private citizens who want to take similar actions that might cause the death of a single migratory bird, like cutting down a tree or mowing a field, to take their chances with the government's prosecutorial discretion.[5]

This court agrees with Judge Hull that, at least in the context of a proposed Forest Service timber sale, the Administrative Procedures Act may be used by a party with standing to challenge government action that would violate the MBTA. *Sierra Club v. Martin*, slip op. at 11–13. Accord, *Chrysler Corp. v. Brown*, 441 U.S. 281, 317–18, 99 S.Ct. 1705, 1725–26, 60 L.Ed.2d 208 (1979). This result is correct because the APA permits challenges to agency action that is contrary to law; it is reasonable because citizens can reasonably expect, at least generally, that the government should abide by the same laws imposed on private citizens.

That conclusion brings us back to the question whether the proposed logging activities during nesting season would violate the MBTA. Although the statutory language is broad, and although the government has stretched it to its limits at least twice (in *FMC Corp.* and *Corbin Farm Service* ), this court believes that the MBTA should not be read to prohibit any and all deaths of migratory birds that may result from logging operations in national forests, even in nesting season. This conclusion is based on the language and history of the MBTA and its

application, as well as the many other statutes that regulate logging in national forests. It is also based on the apparent lack of a reasonable principle to limit the broad reading relied upon by Mahler. Properly interpreted, the MBTA applies to activities that are intended to harm birds or to exploit harm to birds, such as hunting and trapping, and trafficking in birds and bird parts. The MBTA does not apply to other activities that result in unintended deaths of migratory birds.

First, the language of the statute supports this conclusion. The statute prohibits "killing" migratory birds in a phrase that makes it unlawful to "to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, ... any migratory bird, any part, nest, or egg of any such bird...." 16 U.S.C. § 703. Courts may not disregard the context in which even apparently broad statutory terms are used. The words "take" and "kill" were used in a context that clearly focused on hunting, trapping, and poaching. This context is confirmed by the regulations under the MBTA, which define "to take" in the MBTA as "to pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect." 50 C.F.R. § 10.12. The connection between these words and hunting, trapping, poaching, and trade in birds and their parts is apparent. There simply is no signal in any of these statutory terms that Congress intended the MBTA to be applied to any and all human activity that may result in unintended and accidental deaths of migratory birds (including logging operations).

The phrase "by any means or in any manner" can easily be understood as intended to reach the full range of means for hunting or capturing birds, so that creative hunters and poachers could not avoid the statute by de-

---

**5.** In its brief in opposition to Mahler's Rule 59(e) motion, the Forest Service argued:

Courts have recognized that enforcement actions pursuant to the MBTA are not limited to those involving hunting or poaching. [citing *FMC Corp. & Corbin Farm Service*] On the other hand, not every migratory bird death results in a "take" within the meaning of the MBTA. [citing nothing] As this Court has already recognized, MBTA enforcement deci-

sions are committed to agency discretion. Opinion at 1581. *To the extent that bird deaths directly resulting from logging activities might fall within the reach of the MBTA, such matters are committed to the enforcement and prosecutorial discretion* of the United States Fish and Wildlife Service. Authorized employees of the Department of the Interior have *exclusive* authority for criminal enforcement of the MBTA. 16 U.S.C. § 706.

Brief at 6–7 (first emphasis added).

vising new techniques to accomplish their ends. The phrase, while broad, need not be read as extending the statute to activities that cause unintended deaths of birds—the result that the Second Circuit said in *FMC Corp.* would "offend reason and common sense." 572 F.2d at 905.

Second, the history of the statute also does not show any concern for migratory bird deaths that result incidentally from human activity that is not intended to kill or capture birds. The focus of the MBTA has always been the hunting and trapping of birds, and commercial trafficking in birds and bird parts. Congress enacted the MBTA in 1918 to implement a treaty between the United States and Great Britain (on behalf of Canada) "for the protection of the many species of birds [which] in their annual migration traverse certain parts of the United States and ... Canada." *United States v. State of North Dakota,* 650 F.2d 911, 913 (8th Cir. 1981) (quoting Migratory Bird Treaty Act, 39 Stat. 1702). The MBTA applies to hunting, capture, possession, and sale of migratory birds and their parts. *North Dakota,* 650 F.2d at 913.

In 1960, Congress amended the MBTA to authorize more severe penalties for "market hunters" who slaughter wild fowl for commercial purposes as a means of livelihood. See Sen.Rep. No. 1779, 86th Cong., 2d Sess. 1, 1960 U.S.C.C.A.N. 3459; 16 U.S.C. § 707(b). The 1960 amendments added the felony provision in 16 U.S.C. § 707(b) and authorized forfeiture of guns, traps, nets, and other equipment, vessels, and vehicles used by persons when pursuing, hunting, taking, and trapping birds with the intent to sell them. 16 U.S.C. § 707(c). Describing the need for these amendments, the Senate Report states:

> Under existing law, an individual who hunts migratory birds for pleasure and who takes one more bird than the limit, or who hunts a few minutes before or after sunset, is liable to the same penalties as a person who slaughters these wildfowl for commercial purposes as a means of livelihood.

Sen.Rep. No. 1779, 86th Cong., 2d Sess. 1 (1960), *reprinted in* 1960 U.S.C.C.A.N. 3459.

In 1974, Congress amended the MBTA again to extend its coverage to "any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof." 16 U.S.C. § 703; Sen.Rep. No. 851, 93rd Cong., 2d Sess. 3 (1974), *reprinted in* 1974 U.S.C.C.A.N. 3250, 3252. This language prohibiting use of secondary products derived from migratory birds again reflects an intent to prohibit activity that is intended to kill or capture birds. There is again no indication that Congress intended to reach activities not even intended to kill or capture birds.

In 1986, Congress again amended the MBTA to add a *scienter* requirement for felony violations. This amendment was a direct response to a Sixth Circuit decision affirming dismissal of an MBTA charge on due process grounds. The Senate Report states:

> [A] defendant in the U.S. District Court for the Western District of Michigan successfully challenged a felony complaint on the grounds that because the statute does not require 'knowledge', it violates the due process requirements of the Constitution. This decision was upheld by the 6th Circuit Court of Appeals (*U.S. v. Wulff,* 758 F.2d 1121). The effect of this decision is that the felony provisions are meaningless within the 6th Circuit and uncertainty now exists throughout the rest of the country.
>
> By adding the modifier 'knowingly' to the statute, this amendment will cure the unintended infirmity.

Sen.Rep. No. 445, 99th Cong., 2d Sess. 16, *reprinted in* 1986 U.S.C.C.A.N. 6113, 6128. In the *Wulff* case, the defendant was accused of selling a necklace made of red-tailed hawk and great-horned owl talons. 758 F.2d at 1122. Again, the focus was clearly on activity intended to kill or capture migratory birds (and especially to exploit them for commercial purposes). The Senate report on the 1986 amendment stated: "Nothing in this amendment is intended to alter the 'strict liability' standard for misdemeanor prosecutions under 16 U.S.C. § 707(a), a standard which has been upheld in many Federal court decisions." Sen.Rep. No. 445, 99th Cong., 2d Sess. 16 (1986), *reprinted in* 1986

U.S.C.C.A.N. 6113, 6128. This comment in favor of strict liability does not show any intention on the part of Congress to extend the scope of the MBTA beyond hunting, trapping, poaching, and trading in birds and bird parts to reach any and all human activity that might cause the death of a migratory bird. Those who engage in such activity and who accidentally kill a protected migratory bird or who violate the limits on their permits may be charged with misdemeanors without proof of intent to kill a *protected* bird or intent to violate the terms of a permit. That does not mean, however, that Congress intended for "strict liability" to apply to all forms of human activity, such as cutting a tree, mowing a hayfield, or flying a plane. The 1986 amendment and corresponding legislative history reveal only an intention to close a loophole that might prevent felony prosecutions for commercial trafficking in migratory birds and their parts.

Thus, there appears to be no explicit basis in the language or the development of the MBTA for concluding that it was intended to be applied to any and all human activity that causes even unintentional deaths of migratory birds. Yet, given the potential breadth of the phrase "by any means or in any manner," perhaps the context of the language and the absence of explicit legislative support for extending the statute to unintentional killings would not be sufficient alone to decide the question before this court. But the long history of the MBTA and its enforcement also provides important guidance here.

At the risk of gross understatement, a good deal of logging has been done in national forests since the relevant language in the MBTA was enacted in 1916. After all, providing "a continuous supply of timber" was one of the original purposes for establishing national forests back in 1897. See 16 U.S.C. § 475. It is fair to assume that at least some of that logging has occurred during nesting seasons for at least some of the many species of birds covered by the law. It is also fair to assume that the logging during nesting seasons over the past 80 years has sometimes resulted in the deaths of migratory birds. It is also highly probable that logging activities have caused incidental deaths of migratory birds in other ways over these past 80 years. The apparently complete absence of criminal prosecutions for bird deaths resulting from logging, and the government's long record of permitting logging under circumstances where some bird deaths presumably occurred, provide a strong basis for concluding that the statute should not be interpreted, for the first time 80 years after the statute was enacted, as prohibiting such activity.

Many other statutes enacted in the intervening years also counsel against reading the MBTA to prohibit any and all migratory bird deaths resulting from logging activities in national forests. As is apparent from the record in this case, the Forest Service must comply with a myriad of statutory and regulatory requirements to authorize even the very modest type of salvage logging operation of a few acres of dead and dying trees at issue in this case. Those laws require the Forest Service to manage national forests so as to balance many competing goals, including timber production, biodiversity, protection of endangered and threatened species, human recreation, aesthetic concerns, and many others. See, *e.g.,* 16 U.S.C. § 1600 *et seq.* (NFMA); 42 U.S.C. § 4321 *et seq.* (NEPA); 16 U.S.C. § 528 *et seq.* (Multiple–Use Sustained–Yield Act of 1960); 16 U.S.C. § 1531 *et seq.* (Endangered Species Act).

Congress authorized creation of the national forests in 1897 "for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States." 16 U.S.C. § 475. Under Mahler's expansive view of the MBTA, the balances between competing purposes established by these many statutes and regulations would be altered suddenly and dramatically. It would be a federal crime for anyone to cut down any tree that housed a nest for any bird covered by the MBTA, unless a permit had first been obtained.[6] Such a

---

**6.** The MBTA and its regulations do contemplate exceptions to the general prohibition on "taking" migratory birds, but none of the exceptions appear to be compatible with logging operations.

See *16 U.S.C. § 704; 50 C.F.R. § 21.01 et seq.* The regulations specify rules to apply to a broad range of circumstances such as taxidermy (50 C.F.R. § 21.24), and falconry (50 C.F.R.

holding would substantially restrict, and might even effectively prohibit, most logging on both public and private lands. See James A. Siemans, *A "Hard Look" at Biodiversity and the National Forest Management Act,* 6 Tulane Envtl.L.J. 157 (Winter 1992) (noting that the MBTA makes it a federal crime to kill a migratory bird or cut down a nest tree and that under the APA it may be arbitrary and capricious for the Forest Service to initiate timber harvesting in violation of the MBTA). The national forest system provides over one-third of the United States' domestically processed lumber and plywood. Mark C. Rutzick, *Wildlife Constraints on Timber Harvesting,* 5 Natural Resources and Env't 10 (Winter 1991). Adopting Mahler's new interpretation of the MBTA would upset the balance established by these other laws by giving absolute priority to the life of a single bird. That would effectively eliminate the Forest Service's ability to provide timber resources for production, at least for several months of every year.

Also relevant to the court's interpretation of the MBTA is the apparent lack of any meaningful limits on Mahler's broad interpretation of the language on killing "by any means or in any manner." Even the courts that interpreted the language broadly expressed misgivings about its breadth, but they did not identify meaningful limits. In *United States v. FMC Corp.,* the Second Circuit upheld a criminal conviction on eighteen counts for bird deaths resulting from the defendant's release of toxic substances into a wastewater pond. The district court had imposed a fine of only $500 for the convictions, although the law permits a prison sentence of up to six months and a fine of $500 per violation. The jury was instructed that it should convict even if it found that the bird deaths were accidental or unintentional. 572 F.2d at 904. The Second Circuit brushed off as a *reductio ad absurdum* the defendant's argument that a corporate officer could be sent to prison for many years with consecutive sentences, and also treated as a *reductio ad absurdum* the government's claim that the statute prohibits killing birds "without limitation." *Id.* at 905. See also *United States v. FMC Corp.,* 428 F.Supp. 615, 617 n. 2 (W.D.N.Y.1977) (expressing misgivings about applying MBTA to deaths of birds caused by accident or by activity such as clearing land for housing, recreation, and highways).[7]

The Second Circuit commented: "Certainly construction that would bring every killing within the statute, such as deaths caused by automobiles, airplanes, plate glass modern office buildings or picture windows in residential dwellings into which birds fly, would offend reason and common sense." *FMC Corp.,* 572 F.2d at 905. Few would disagree. But the Second Circuit did not resolve this problem by offering a limiting construction of the statute. Instead, it responded to this problem as follows: "As stated in one of the early decisions under the Act, '[a]n innocent technical violation on the part of any defendant can be taken care of by the imposition of a small or nominal fine.' Such situations properly can be left to the sound discretion of prosecutors and the courts." *Id.* (citing *United States v. Schultze,* 28 F.Supp. 234, 236 (W.D.Ky.1939)). Such trust in prosecutorial discretion is not really an answer to the issue of statutory construction.[8] Also, for

---

§ 21.28). The regulations also provide for "special purpose permits." 50 C.F.R. § 21.27. However, none of the regulations contemplate permits for logging operations. Cf. 50 C.F.R. § 21.12 (allowing an exception to permit requirements for employees of the U.S. Department of the Interior). Moreover, the permit regulations require permit holders to keep precise records describing the conduct of the permitted activity, and the numbers and species of migratory birds acquired and disposed under the permit. 50 C.F.R. § 21.27 (covering special purpose permits); 50 C.F.R. § 13.46 (general permits). The detailed reporting requirements show that the regulations for exceptions are not compatible with logging operations or other activities that

may unintentionally destroy some nests and cause the deaths of some birds.

7. Recall also that in *Corbin Farm Service,* the government argued that "knowledge of the birds and intent to affect birds is irrelevant and that the Act permits conviction of any person whose actions result in the death of birds." 444 F.Supp. at 534.

8. But perhaps some reliance on the limited patience of busy courts may also limit use of the statute in criminal prosecutions. See *Van Fossan,* 899 F.2d at 637 ("This case is for the birds"; noting skeptically that prosecutor had character-

many defendants who may well be quite law-abiding, the significance of having *any* federal criminal conviction cannot be diminished by the fact that the penalties are not terribly severe.

 Mahler's reliance on the broad "by any means or in any manner" language of the MBTA cannot be limited to the context of *logging during nesting season.* His logic would surely extend to any loss of birds or eggs resulting from logging operations at any time. Nor can the logic be limited to logging operations at all. If the controlling statutory language becomes the phrase "by any means or in any manner" with its full sweep, there is no obvious reason why the MBTA could not apply to any deaths of migratory birds occurring as a result of human activity, including those examples dismissed by the Second Circuit as offending reason and common sense: "deaths caused by automobiles, airplanes, plate glass modern office buildings or picture windows in residential dwellings into which birds fly." Reliance on prosecutorial discretion is not, of course, a limiting principle of statutory interpretation. The better reading of the statute is to find that the prohibitions apply only to activity that is

ized the case, involving deaths of two common grackles and two mourning doves, as "one of the most important cases" of his office).

9. The Second Circuit in *FMC Corp.* tried to find a limiting principle in the policy and logic of strict liability for hazardous commercial activity. 572 F.2d at 907. That policy and logic may, of

intended to kill or capture birds or to traffic in their bodies and parts.[9]

## Conclusion

For all these reasons, this court does not believe that an 80 year old statute is properly interpreted for the first time to effectively prohibit activity that has gone on apace during the entire time the statute has been on the books. Such delayed and significant changes in the law are not unknown, but they surely are rare. The Forest Service complied with the NFMA and NEPA when it adopted the 1991 Plan Amendment and when it decided to conduct the red pine salvage sale. The red pine salvage operation will not result in a violation of the MBTA. Mahler's motion to alter or amend judgment is therefore DENIED. Mahler's separate motion for a temporary restraining order is DENIED AS MOOT.

So ordered.

course, properly inform prosecutorial discretion (and perhaps the sentencing discretion of courts). But they have no apparent basis in the statute itself or in the prior history of the MBTA's application since its enactment. In any event, that reasoning would not support application of the MBTA's prohibitions to logging activities.